COMMONWEALTH *vs.* WILLIAM CORY JAMES
(and five companion cases[1] ).

Suffolk. January 9, 1997. - April 23, 1997.

Present: WILKINS, C.J., O'CONNOR, GREANEY, FRIED, & MARSHALL, JJ.

*Practice, Criminal,* Venue, Continuance, Fair trial, Instructions to jury,
Required finding, Reasonable doubt, Capital case. *Search and Seizure,*
Probable cause, Affidavit, Warrant. *Constitutional Law,* Search and
seizure, Probable cause, Confrontation of witnesses. *Probable Cause. Ev-
idence,* Knife, Credibility of witness. *Witness,* Credibility. *Intoxication.
Homicide.*

At a murder trial, in which the judge conducted individual voir dire of
each juror with respect to impartiality and media coverage and in which
the jury were sequestered, the defendants did not demonstrate that, in
the totality of the circumstances, pretrial publicity deprived them of
their right to a fair trial. [775-777]

In a murder case, the judge correctly concluded that an affidavit attached
to certain search warrants contained sufficient facts to establish probable
cause to support issuance of the warrants and to believe that the listed
items would be found in the places described; further, the judge cor-
rectly concluded that an eighteen-day period before the issuance of the
warrant did not render the information in the affidavits stale. [777-779]

At a murder trial, the judge properly admitted in evidence certain knives
seized at the defendants' residences that could have been used by them
in committing the murder [779-780], and there was no requirement that
the judge give a limiting instruction on the use of that evidence, where
the probative value of the evidence outweighed any prejudicial effect.
[780-781]

At a murder trial, there was no violation of the *Bruton* principle (*Bruton* v.
*United States,* 391 U.S. 123, 135-136 [1968]) in the admission in evi-
dence of the extrajudicial statement of a nontestifying codefendant,
where the statement did not inculpate the testifying defendant, but
merely raised an association between the codefendant and the defendant;
any possible harm could be and was curtailed by the judge's clear and
forceful prophylactic instructions. [781-784]

There was no merit to criminal defendants' argument that the judge erred
in denying their motions for required findings of not guilty because the
testimony of the main witness against them was inherently unreliable.
[784-785]

At the trial of murder indictments there was no requirement that the judge
give instructions concerning the credibility of a juvenile witness in ac-

[1]Three against Carlos Garcia and two against William Cory James.

cordance with *Commonwealth* v. *Ciampa*, 406 Mass. 257 (1989), in circumstances in which there was no reason for the jury to believe the Commonwealth had any influence over the juvenile's testimony, nor could they have inferred that the Commonwealth was vouching for that witness's credibility. [785-787]

At the trial of murder indictments, the judge's instructions on reasonable doubt did not lower the Commonwealth's burden of proof below the standard required by the due process of law provisions of the Fifth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. [787-788]

At the trial of murder indictments in which the evidence of the defendants' consumption of alcohol did not support a reasonable inference that they were so intoxicated at the time of the killing that they could not form the requisite criminal intent, there was no error or substantial likelihood of a miscarriage of justice in the judge's instructing the jury that they could take into account the effects of alcohol on the defendants' states of mind. [788-790]

At a murder trial, there was no substantial likelihood of a miscarriage of justice arising from the judge's instructions on extreme atrocity or cruelty, where the evidence of the cruelty and brutality of the killing of the victim was compelling. [790-791]

No reason appeared for this court to exercise its power under G. L. c. 278, § 33E, to order new trials or to reduce the verdicts of murder in the first degree. [791]

INDICTMENTS found and returned in the Superior Court Department on January 3, 1991.

The cases were tried before *Robert A. Mulligan*, J.

*Alan Jay Black* for William Cory James.

*Bernard Grossberg* for Carlos Garcia.

*Paul B. Linn*, Assistant District Attorney, & *Kelly Ann Downes*, Assistant District Attorney, for the Commonwealth.

MARSHALL, J. On March 12, 1992, at the conclusion of a joint trial, a jury found the defendant William Cory James guilty of murder in the first degree on the theories of extreme atrocity or cruelty and felony-murder, of aggravated rape, and of armed robbery.[2] The jury found the defendant Carlos

---

[2]The jury found James not guilty of armed assault with intent to rob a second victim. The judge sentenced James to concurrent terms of life imprisonment on the convictions of murder in the first degree and armed robbery, and an additional term of from twenty-five to thirty years on the aggravated rape conviction to be served after the completion of his sentence for murder in the first degree.

Garcia guilty of murder in the first degree on the theory of felony-murder, aggravated rape, and armed robbery.[3]

On direct appeal James alleges error in (1) the denial of a motion for a change of venue and a motion for a continuance; (2) the denial of a motion to suppress evidence seized from his residence and the failure of the trial judge to give a limiting instruction concerning the purpose for which that evidence could be considered; (3) the omission of a cautionary instruction regarding the testimony of one witness; (4) the denial of a motion for required findings of not guilty, and (5) the judge's instructions on reasonable doubt, voluntary intoxication, and extreme atrocity or cruelty.[4] Garcia argues that an extrajudicial statement of James was admitted in violation of *Bruton* v. *United States,* 391 U.S. 123 (1968). We affirm the convictions. We decline to order a new trial or to exercise our extraordinary power under G. L. c. 278, § 33E.

1. *Facts.* We summarize the pertinent facts as they could have been found by the jury. On October 31, 1990, Halloween evening, the two defendants and six other young men[5] gathered at James's residence, drinking from a case of forty-ounce bottles of "Private Stock" beer that James had acquired. After approximately one-half hour of drinking, the group left the house with the intent of robbing "prostitutes." As they walked together across Franklin Field they decided to form two groups. Emerging from Franklin Field, they saw two women, the victim, Kimberly Rae Harbour, and another woman, Linda,[6] who were conversing on a sidewalk across from Franklin Field. The two women, seeing the group approaching them, became apprehensive and tried to run away.

[3]The jury found Garcia not guilty of armed assault with intent to rob a second victim. The trial judge sentenced Garcia to concurrent terms of life imprisonment on the convictions of murder in the first degree and armed robbery, and an additional term of from fifteen to twenty years for the aggravated rape conviction to be served after the completion of his sentence for murder in the first degree.

[4]On May 10, 1996, Garcia filed a motion to adopt the arguments presented by James; he filed no separate brief with respect to any of those issues. We allow his motion, and consider the issues on appeal as though raised originally by both defendants.

[5]These young men were juveniles at the time and were tried separately from James and Garcia. See, e.g., *Commonwealth* v. *Floyd P.,* 415 Mass. 826 (1993); *Commonwealth* v. *Barnes,* 40 Mass. App. Ct. 666 (1996).

[6]We use the same fictitious name as the Appeals Court used in a related case. See *Commonwealth* v. *Barnes, supra* at 667.

The young men gave chase. They quickly caught the two women, who were by then on different sides of the street.

After catching Linda, one of the men struck her forcefully across the back of her head with a tree limb. Three of them then intrusively searched her for money but, finding nothing of value, released her. They then crossed the street to join the others who had caught Harbour. Linda testified that she heard Harbour calling for help, witnessed several of the young men kick her as she fell to the ground and then continue to chase her as she attempted to run away again.[7]

The two defendants were part of the group who initially chased Harbour as she attempted to flee. At trial, another participant, a juvenile, described the events that followed and the roles played by the two defendants. The group caught the victim and, as she shouted for help and struggled, carried her to a remote location in Franklin Field. There, the victim tried to fight and pleaded for the group to let her go. They ignored her entreaties, stripped off her clothes and six of the eight attackers then took turns raping her. The eyewitness testified that James was the first to rape Harbour. Garcia did not rape her. While she was being raped, others repeatedly kicked her, and Garcia struck her in the face with a beer bottle which shattered on impact. James was the first to attack her with his knife. He and at least one other slashed Harbour with a knife, stabbing her arms, stomach, back, and legs. The stabbing wounds inflicted were consistent with cuts inflicted by two different kinds of knives and with cuts from the neck of a broken bottle. One or more of the group also beat her with the tree limb which had been used to assault Linda. The eyewitness also said that Garcia struck her a second time in the face with another beer bottle.

The attacks on Harbour lasted for about one-half hour; she begged for mercy throughout. The group then gathered the victim's clothes which they took away with them. As they were moving away, they discussed whether Harbour was still alive. James turned back to Harbour and with a running jump landed on her, causing her to scream. He then returned to the group and they all left Franklin Field. They threw

[7]Linda did not see Harbour again. A man whom she did not know, who happened on the scene of the assault, offered to take Linda to a hospital. When she declined, he took her to her home. She never saw the man again and the police never located him.

Harbour's clothes into a dumpster and agreed with each other that they would not say anything about the attack on Harbour.[8] The nude, lifeless body of the victim was discovered the next morning.

At the scene of the crime, police found the broken glass fragments of a forty-ounce "Private Stock" beer bottle under and around the victim's head. Near her body they also found the broken parts of a large tree branch, pieces of a condom, and articles of the victim's clothing. A footwear pattern was discovered on one of the pieces of clothing.

The medical examiner determined that Harbour had died from 132 knife wounds covering her entire body, at least eighteen blunt force injuries, and extensive blood loss. The pattern of blood suggested that Harbour had sustained the wounds while she was struggling, and that she had died slowly from loss of blood. He further determined that there were variations in the knife wounds that were consistent with wounds caused by both single-edged knives, such as the knife later found in James's residence, and double-edged knives, such as the knife found later in Garcia's residence.

During the subsequent investigation, one of the attackers gave a statement to the police identifying the assailants, including both defendants.[9] On November 18, 1990, the police obtained warrants to search the defendants' homes for "007" or similar knives, dark clothing, face masks, and sneakers.[10] At James's residence, the police recovered an "007" knife and five pairs of sneakers. The police seized a knife and two pairs of sneakers from Garcia's residence.

On November 19, 1990, James waived his Miranda rights and made a statement to the police that was recorded. He told the police that on the night of the killing he had been at home drinking beer with friends. He identified Garcia as one of those present. He said that at approximately 8 P.M. he and

[8]Later that night, the Boston fire department responded to a report of a dumpster fire in the Franklin Field housing project and extinguished the fire.

[9]He described the attack in detail, and said that members of the group routinely carried "007" knives that they used against Harbour. The medical examiner testified that some of Harbour's injuries were consistent with being attacked with such a knife.

[10]Statements to the police by one of the attackers and by Linda confirmed that the group all had been wearing dark clothing, "Lone Ranger" type face masks, and sneakers.

the others left his house; they walked with Garcia to his nearby residence, left him there and then all went their separate ways. James said that Garcia mentioned in passing that he might go to his girl friend's house, but James did not know whether he had done so. James told the police that he himself had gone to his girl friend's house, where he stayed for the remainder of that night. He recalled that the next day, at approximately 1 P.M. or 2 P.M., he had received a telephone call from "one of [his] boys," whom he thought was Garcia. James denied participating in the rape and murder of Harbour.

This young woman testified at trial. She contradicted the statement James had given to the police and denied that he had been with her on the night of Halloween, 1990. James did not testify. Garcia presented an alibi defense. His brother and his brother's girl friend each testified that from 8:30 to 10:30 P.M. on the night of the attack on Harbour, they had visited Garcia's home where he lived with his mother. They said that Garcia was at home during that entire time, studying for a Spanish test.[11]

2. *Change of venue or continuance.* There was extensive media coverage of the crimes. In addition, two days before the start of the trial, there was a march and candlelight vigil to oppose crimes of violence within the Black community, during the course of which the victim and the circumstances of her death were remembered.[12] Those events also were widely covered by the media. In light of this, the defendants sought a change of venue or, in the alternative, a continuance of the trial. The judge denied both motions, rulings that the defendants allege deprived them of their right to a fair and impartial jury. A trial judge has substantial discretion in deciding whether to grant a motion for change of venue or continuance based on pretrial publicity. See *Commonwealth v. Colon-Cruz,* 408 Mass. 533, 551 (1990); *Commonwealth* v. *Bianco,* 388 Mass. 358, 367, *S.C.,* 390 Mass. 254 (1983). We conclude that the judge did not abuse his discretion in denying the motions.

We have said that a trial judge should exercise the discre-

---

[11]Garcia's mother could not testify because she had passed away before the trial.

[12]According to information submitted to the judge, the events were part of the fifth annual Black Youth Pride March.

tion to change venue or to continue a trial "with great caution and only after a solid foundation of fact has been first established." *Commonwealth* v. *Colon-Cruz, supra* at 551, quoting *Commonwealth* v. *Smith,* 357 Mass. 168, 173 (1970). There is no dispute here concerning the extent of the pretrial publicity. But the existence of pretrial publicity alone, even if extensive, does not constitute such a foundation. See *Commonwealth* v. *Colon-Cruz, supra,* and cases cited; *Delle Chiaie* v. *Commonwealth,* 367 Mass. 527, 532 (1975), citing *Sheppard* v. *Maxwell,* 384 U.S. 333, 354-355 (1966). Rather, a defendant must show that in the totality of the circumstances, "such publicity deprived him of his right to a fair trial." *Delle Chiaie* v. *Commonwealth, supra.* See *Commonwealth* v. *Angiulo,* 415 Mass. 502, 515 (1993).

The defendants failed to make that showing. On appeal, as they did below, the defendants emphasize in particular the march and candlelight vigil and the media coverage of those events two days before the start of the trial. They argue that this increased the potential for prejudice in the minds of the jurors, but they do not point to any evidence to that effect. The judge recognized the possible impact on the jurors of the pretrial publicity,[13] and he took careful steps to ensure that the media coverage did not interfere with the fairness of the trial. He conducted an individual voir dire of each prospective juror, asking each whether he or she had been exposed to any pretrial publicity about the case, and if so, whether they could nevertheless be impartial.[14] See *Commonwealth* v. *Colon-Cruz, supra* at 552; *Commonwealth* v. *Bianco, supra* at

---

[13]The judge observed, however, that the reason for the march was not to focus on the death of Harbour but on violence within the Black community. He also observed that both defendants intended to present alibi defenses (which they did) and that the news reports were not necessarily prejudicial to them. Neither counsel objected to the judge's characterization of the news reports.

[14]Before he commenced his questioning of the jurors, the judge invited counsel to inform him whether they believed that there was any area that needed further examination with respect to any particular juror. From time to time during the individual voir dire by the judge, counsel did request that additional questions be asked of a particular juror, requests that were granted in each case by the judge. The defendants now complain that the judge did not allow counsel to conduct individual examinations of jurors, as had been the case in *Commonwealth* v. *Colon-Cruz,* 408 Mass. 533, 552 (1990). At trial, counsel did not make any such request. In any event, there is no requirement that counsel examine jurors, particularly where the judge

368. On several occasions potential jurors were excused at least in part because the media coverage of the crimes had left them unable to be impartial. In other cases the judge accepted, as he was entitled to, the statement of jurors of their "disinterest and freedom from emotional or intellectual commitment." *Id.* On defense motions, the judge also ordered that the jury be sequestered.

A defendant's right to a fair and impartial jury does not require that jury members have no prior knowledge of the crime. We have reviewed the record, and there is no indication that the defendants were tried before a biased jury. *Commonwealth* v. *McLaughlin,* 352 Mass. 218, 225, cert. denied, 389 U.S. 916 (1967). The verdicts demonstrate that the jury were able to sift through the evidence and reach their verdicts with respect to each defendant, finding them not guilty with respect to certain charges and guilty with respect to others.

3. *Motions to suppress.* The defendants next claim that evidence found during searches of their respective residences should have been suppressed because the search warrants were constitutionally defective. The judge found, and we agree, that an affidavit attached to the warrants contained sufficient facts to establish probable cause to support issuance of the warrants and to believe that the listed items reasonably could be expected to be located at James's and Garcia's residences. He also concluded, correctly, that the underlying information was not stale.

An affidavit to establish probable cause must contain "enough information for an issuing magistrate to determine that the items sought are both related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues." *Commonwealth* v. *Cinelli,* 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983). Affidavits must be "tested and interpreted by magistrates and courts in a commonsense and realistic fashion. . . . Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police." *Commonwealth* v. *Atchue,* 393 Mass. 343, 346 (1984), quoting *United States* v.

is so responsive to questions suggested by trial counsel. See *Commonwealth* v. *Bianco,* 388 Mass. 358, 368, *S.C.,* 390 Mass. 254 (1983); *Delle Chiaie* v. *Commonwealth,* 367 Mass. 527, 532 (1975).

*Ventresca*, 380 U.S. 102, 108-109 (1965). We have also said that courts should not invalidate a warrant by interpreting the affidavit "in a hypertechnical, rather than a commonsense manner." *Id.*

Here, it was reasonably likely that the items specified in the affidavit and seized during the searches would be found at the defendants' residences. Based on specific facts obtained from eyewitnesses to the attacks and described in detail in an affidavit of one of the investigating police officers, the police were authorized to search for "007" or similar knives, sneakers, dark clothing, and face masks. As the judge found, all of these items are durable, of continuing utility to the defendants, and it was reasonable to expect that they would be kept at home, particularly as they are not inherently incriminating to possess. See *Commonwealth* v. *Cinelli, supra* at 213-214 & n.16; *Commonwealth* v. *Cefalo*, 381 Mass. 319, 329-330 (1980).

With respect to the weapons, the affidavit recited that the members of the group that attacked Harbour were known to carry "007" knives on a regular and continuing basis. There was no reason for the defendants to dispose of these items when they were unaware that they had been identified to the police. *Commonwealth* v. *Cinelli, supra* at 213. Moreover, knives, unlike firearms, can be cleaned of any incriminating evidence.[15]

Nor are we persuaded that the warrants were defective because the information in the supporting affidavit was stale. While the principle that facts supporting probable cause must be "closely related to the time of the issue of the warrant [so] as to justify a finding of probable cause at that time." *Sgro* v.

[15]There is evidence that this occurred. The knife found at the residence of James had been tampered with so as to allow the removal of the blade, and the knife appeared to have been recently and thoroughly cleaned. The defendants rely here, as they did below, on *United States* v. *Charest*, 602 F.2d 1015, 1017 (1st Cir. 1979), to support their claim that probable cause to search their residences for knives was not established. In *Charest*, unlike here, the court reasoned that a defendant would not keep at home an incriminating handgun which could be readily identified as the murder weapon through ballistics tests. *Id.* Knives, unlike guns, are not subject to ballistics-type identifying data; it was reasonable to conclude that they were likely to be found at the residence of the defendants in view of the reliable information given to the police that members of the group carried "007" knives on a continual basis.

*United States,* 287 U.S. 206, 210 (1932), the timeliness must be "determined by the circumstances of each case." *Id.* at 210-211. *Commonwealth* v. *Atchue, supra* at 349. In this case the passage of eighteen days before the issuance of the search warrant was not unreasonable. See 2 W.R. LaFave, Search and Seizure § 3.7(a), at 348 (3d ed. 1996). The judge was correct to deny the motions to suppress.

4. *Admission in evidence of knives seized at defendants' residences.* The defendants challenge the admission of knives seized at their residences, asserting that the relevance of the evidence was outweighed by the unfair prejudice arising from the admission of the knives. Because, they argue, there was no evidence that the defendants used the knives on the night of the killing, and because the evidence was seized at a time too remote from the killing, the jury would draw adverse conclusions about their character and their propensity to commit crimes based on nothing more than their possession of the knives. It was in the judge's discretion to admit the knives that were in the defendants' possession and that could have been used by them in the murder of Harbour. *Commonwealth* v. *Toro,* 395 Mass. 354, 356 (1985), and cases cited. We conclude that the judge acted entirely properly when he did so.[16]

"[I]t is commonly competent to show the possession by a defendant of an instrument capable of being used in the commission of the crime, without direct proof that that particular instrument was in fact the one used." *Commonwealth* v. *O'Toole,* 326 Mass. 35, 39 (1950). The knives found in the defendants' residences were relevant to show that the defendants had the means of committing the offense.[17] *Commonwealth* v. *Storey,* 378 Mass. 312, 322 (1979), cert. denied,

---

[16]The defendants also argue that it was prejudicial error for the judge to admit in evidence a number of pairs of sneakers seized from the defendants. While the sneakers were marked for identification, they were not admitted in evidence and the argument is meritless.

[17]An eyewitness testified that James stabbed Harbour repeatedly. The medical evidence was that Harbour was stabbed with both a blunt-edged weapon and a sharp-edged weapon; the knife seized from James's residence had a blunt edge and the medical examiner testified that the knife was consistent with causing the blunt-edge wounds, and that it could have been used in the murder. See *Commonwealth* v. *Hamilton,* 411 Mass. 313, 322 (1991); *Commonwealth* v. *Gagnon,* 408 Mass. 185, 199-200 (1990); *Commonwealth* v. *Ascolillo,* 405 Mass. 456, 461 (1989).

Garcia's claim rests on an independent factual basis, but the argument

446 U.S. 955 (1980); *Commonwealth* v. *Bartolini*, 299 Mass. 503, 512, cert. denied, 304 U.S. 565 (1938) (possession, and familiarity with use of knife to dismember victim's body "alone would fall far short of proving guilt, but in connection with the other evidence in this case, it had some legitimate probative force"). Whether or not the knives in question were in fact used in the killing was an issue "the jury surely understood." *Storey, supra.*[18]

The defendants next assert that there was a substantial likelihood of a miscarriage of justice because the judge did not instruct the jury to limit their consideration of the knives to the issue whether the defendants had the means to commit the offense.[19] There was no error. Where evidence is admissible to show the possession by the defendant of an instrument capable of being used to commit the crime charged — particularly where, as here, the probative value of the evidence outweighed any prejudicial effect — we have held that a limiting instruction is not required. See *Commonwealth* v.

with respect to the knife seized at his house relates generally to James's argument and is appropriately incorporated by reference, pursuant to Mass. R. A. P. 16 (j), 365 Mass. 860 (1974). There was no direct testimony that Garcia used a knife during the attack on Harbour. But there was circumstantial evidence that his knife could have been one of the murder weapons. There were multiple sharp-edged knife wounds inflicted on Harbour, consistent with the knife seized at Garcia's residence, and the medical examiner testified that the knife could have been used to attack Harbour. In addition, the Commonwealth proceeded against Garcia on a theory of joint venture. To establish his culpability, the Commonwealth was not required to present direct evidence of who actually inflicted the fatal wounds. *Commonwealth* v. *Williams*, 422 Mass. 111, 121-22 (1996). There was strong circumstantial evidence that at least one assailant stabbed Harbour with a knife such as Garcia's.

[18]James argues that there was no evidence of any blood on his knife and the knife was not directly proved to be the murder weapon. However, there was evidence that the knife had been thoroughly cleaned, from which the jury could have inferred that James had sought to eradicate all traces of the victim's blood. Such evidence could evince consciousness of guilt. *Commonwealth* v. *Jackson*, 417 Mass. 830, 843 (1994). *Commonwealth* v. *Toney*, 385 Mass. 575, 584 n.4 (1982).

[19]Neither defendant requested a limiting instruction as to the purpose for which the evidence was offered, and no such instruction was given. The judge did instruct the jury that the Commonwealth need not prove that the knives were the same as those used in the murder.

*Hamilton, supra* at 322; *Commonwealth* v. *Storey, supra* at 322.

5. *The* Bruton *issue.* Relying on *Bruton* v. *United States,* 391 U.S. 123, 135-136 (1968), Garcia asserts that his constitutional right to confront an adverse witness was violated by the admission of the extrajudicial statement of his nontestifying codefendant James. *Bruton* v. *United States, supra* at 135-136, held that a defendant was deprived of his Federal constitutional rights of confrontation[20] when his codefendant's "powerfully incriminating extrajudicial statements" inculpating him in the crime were admitted and the codefendant did not testify and expose himself to cross-examination, despite the prophylactic instructions to the jury to consider the confession only against the codefendant.

Garcia argues that James's statement, taken in the context of the testimony of the eyewitness to the attack and of the failure of James's alibi defense, was powerfully incriminating of him, and that there is a "substantial possibility" that in determining his guilt the jury relied on James's statement, notwithstanding the limiting instructions from the judge. Garcia recognizes that James's statement does not directly inculpate him in the attack on Harbour. His claim rests rather on a series of inferences which he says the jury could have drawn from the statement; the prejudicial inculpatory connection between James's statement and himself, he says, "may be supplied by the content of the statement taken in connection with other evidence in the case." *Commonwealth* v. *LeBlanc,* 364 Mass. 1, 8 (1973).

James's statement refers frequently to Garcia by name; James referred to Garcia as "one of my boys" and as a friend of his, and James placed the two together several hours before the murder, as well as having a conversation on the day following the murder. The repeated references to him, Garcia says, strengthened the Commonwealth's case against him, lent credibility to the Commonwealth's case that the defendants corroborated to create a cover-up after the mur-

---

[20]Garcia also claims protection under art. 12 of the Massachusetts Declaration of Rights which guarantees a defendant the right "to meet the witnesses against him face to face." He does not argue that art. 12 provides greater protection than does the Sixth Amendment to the United States Constitution, or that our analysis should differ depending on the constitutional source of the protection claimed.

der, and "pulled [him] into" James's demonstrably false alibi. We consider his claims in light of our rulings and those of the Supreme Court subsequent to *Bruton*.

In *Richardson* v. *Marsh*, 481 U.S. 200, 208 (1987), the Supreme Court substantially restricted the scope of its *Bruton* rule, limiting its application to cases where the codefendant's statement "expressly implicate[s]" the defendant, leaving no doubt that it would prove to be "powerfully incriminating." *Id.*, quoting *Bruton*, *supra* at 124 n.1, 135. The *Bruton* rule is a "narrow exception" to the "almost invariable assumption of law that jurors follow their instructions," and there is no *Bruton* error where the statement becomes incriminating "only when linked with evidence introduced later at trial." *Richardson*, *supra* at 206, 208. Our considerations of the *Bruton* rule mirror that standard. Where a nontestifying codefendant's statement inferentially inculpates another defendant, we have recognized that it is not constitutionally required to consider the evidentiary context of the codefendant's statement so long as there is an adequate limiting instruction. *Commonwealth* v. *Keevan*, 400 Mass. 557, 570 (1987) ("where the challenged statement does not directly inculpate the defendant, other evidence may be relevant to determine if the risk of contextual implication is pressing enough to invalidate the effect of limiting instructions; but . . . absent any direct inculpation, an appropriate instruction is sufficient to obviate *Bruton* concerns").

James's exculpatory statement to the police does not identify Garcia in any way as associated with the crimes charged. In fact his references to Garcia are entirely consistent with the alibi defense presented by Garcia at trial.[21] We recognize, of course, that James did make repeated references to Garcia in his statement. But a statement that does nothing more than raise an association between the defendants is not sufficient to give rise to a *Bruton* challenge. See *Commonwealth* v. *Corradino*, 368 Mass. 411, 419 (1975). There may be some circumstances where a statement merely associating one defendant with another is so incriminating that it may violate the *Bruton* principle, even if it does not directly inculpate him. *United States* v. *DiGregorio*, 605 F.2d 1184, 1190 (1st Cir.), cert. denied, 444 U.S. 937, and cert. denied

---

[21]James stated that he left Garcia at Garcia's home at approximately 8 P.M., placing Garcia precisely where he claimed to be during the killing.

sub nom. *Yanis* v. *United States*, 444 U.S. 983, and cert. denied sub nom. *Delvecchio* v. *United States*, 444 U.S. 944 (1979) (fact that codefendant's extrajudicial admission tended to corroborate government's case against defendant was insufficient to invoke *Bruton*). See, e.g., *Commonwealth* v. *Bongarzone*, 390 Mass. 326, 345 (1983) (*Bruton* rule violated with admission of statement about two professional drug dealers who trafficked in major supplies of marihuana and threatened bodily harm to others, where it was clear that two dealers referred to defendants). In each case, we must determine on the basis of our own reading of the record whether the statement is sufficiently prejudicial to require reversal because the average jury would have found the case against the affected defendant significantly less persuasive without it. *Commonwealth* v. *Corradino, supra* at 419, quoting *Schneble* v. *Florida*, 405 U.S. 427, 432 (1972). See *United States* v. *Limberopoulos*, 26 F.3d 245, 253 (1st Cir. 1994) (statement "cannot be supposed to have implanted in the jurors' minds the kinds of powerfully incriminating impressions against which *Bruton* protects").

We have held that there is a risk of contextual incrimination in cases only where the circumstances of the case and the nature of the codefendant's statement so obviously implicate the defendant in the crime itself as virtually to constitute direct incrimination. See *Commonwealth* v. *Johnson*, 412 Mass. 318, 323 (1992); *Commonwealth* v. *Cifizzari*, 397 Mass. 560, 573 (1986); *Commonwealth* v. *LeBlanc, supra* at 8. Garcia's claims of prejudice are far more attenuated than the claims in any of those cases. The essence of his argument is that only the testimony of one eyewitness explicitly placed him at the scene and as one of the most active participants in the crime. Because the James statement "corroborated" the eyewitness account in some respects, he says, it tended to lend crucial credibility to the eyewitness account, severely tilting the scales against Garcia's alibi defense. We do not agree. There were numerous discrepancies between James's statement and the testimony of the eyewitness, and we are not persuaded that there was any powerful corroboration by James's statement of the eyewitness account of Garcia's participation in the crimes. See *Richardson, supra* at 208-211. Were we to adopt Garcia's argument, any extrajudicial statement of a nontestifying codefendant that refers to the defen-

dant by name would, if admitted as to the codefendant, violate the *Bruton* principle, even though the statement directly exculpates the defendant.[22] Because there was no inculpation of Garcia, any possible harm to Garcia could be, and was here, curtailed by prophylactic instructions. *Commonwealth* v. *Pontes,* 402 Mass. 311, 315 (1988).

The judge was keenly aware of Garcia's *Bruton* concerns, and he carefully and appropriately instructed the jury in the strongest terms possible to consider the evidence of James's statement only against James and not against Garcia. He required that each juror, "Put that right down in your notebook,"[23] and then confirmed that each juror had done so by requiring that they affirmatively indicate compliance by nodding their heads. During the final instructions to the jury, the judge again instructed the jury that James's statement "was admitted into evidence exclusively against William [Cory] James. It is not in evidence against Mr. Carlos Garcia." In light of the clear and forceful instructions to the jury we are satisfied that there was no violation of Garcia's right of confrontation.

6. *Required findings of not guilty.* The defendants argue that it was error for the judge to deny their motions for required findings of not guilty. Because, they claim, the Commonwealth's case rested on the testimony of the juvenile witness whose testimony was inherently unreliable — in light of his agreement with the Commonwealth and his admission that he had lied previously to the police — they claim that no rational trier of fact could find for the Commonwealth beyond a reasonable doubt. Their argument lacks merit.

The standard for evaluating a motion for a required finding of not guilty is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979), *S.C.,* 423

---

[22]In admitting James's statement in its entirety the judge correctly noted that no Massachusetts case holds "that putting people together at sometime, one, two, three hours before a crime is committed constitutes a *Bruton* problem."

[23]At the commencement of the trial, the judge had provided each juror with writing materials and had encouraged them to take notes of important matters that arose during the course of the trial.

Mass. 129 (1996), quoting *Jackson* v. *Virginia,* 443 U.S. 307, 318-319 (1979). The defendants do not argue that the juvenile's testimony, if believed, was insufficient to support the convictions beyond a reasonable doubt. Their claim that his testimony was inherently unreliable is nothing more than an issue of credibility, an issue that is solely within the province of the jury. When assessing the sufficiency of the evidence, we resolve issues of credibility in favor of the Commonwealth; "[i]t does not matter that some of the evidence could be characterized as equivocal or contradictory." *Commonwealth* v. *Ruci,* 409 Mass. 94, 97 (1991), quoting *Commonwealth* v. *Melchionno,* 29 Mass. App. Ct. 939, 940 (1990). The trial judge properly denied the motions for required findings of not guilty.

7. *Instructions concerning the credibility of the juvenile witness.* The defendants argue that it was error for the trial judge not to instruct the jury to consider with special care the eyewitness testimony of a juvenile who prior to trial had reached an agreement with the Commonwealth.[24] They rely on *Commonwealth* v. *Ciampa,* 406 Mass. 257 (1989), in which we held that a plea agreement that provided that the prosecution would recommend a particular sentence in return for a witness's "truthful" testimony, in conjunction with repeated references to the truthfulness requirement, gave rise to an implication that the Commonwealth could verify or had verified the truthfulness of his statements. *Id.* at 260-261. See *Commonwealth* v. *Evans,* 415 Mass. 422, 427 (1993). Because of the danger that the jury would infer that the Commonwealth knows or can discover whether the witness is telling the truth, we said that "the judge must specifically and forcefully tell the jury to study the witness's credibility with particular care," and that the judge must focus "the jury's attention on the particular care they must give in evaluating testimony given pursuant to a plea agreement that is contingent on the witness's telling the truth." *Ciampa, supra* at 266.

Here the judge generally instructed the jury that in

---

[24]The juvenile was one of the eight who participated in the attacks on Harbour and Linda. His agreement with the Commonwealth provided generally that in exchange for a statement to the police and his testimony in court against others involved in the attacks, he would remain in the juvenile justice system.

determining the credibility of the witnesses the jury could "consider the witness'[s] motive for testifying and, of course, the interest or lack of interest that a particular witness may have in the outcome of the trial." He also instructed that the jury could "consider any promises, any rewards or inducements that you find are material on the issue." He did not give *Ciampa* instructions.[25]

None of the dangers to which we alluded in *Ciampa* is present here. First, prior to his testimony in this case the juvenile witness already had been tried as a juvenile and found delinquent; he was no longer subject to any promises, rewards, or inducements by the Commonwealth. There was thus no discussion before the jury, let alone emphasis, that his agreement with the Commonwealth was contingent on the veracity of, or the Commonwealth's satisfaction with, his testimony against James and Garcia. The jury heard that he had agreed to testify against the defendants in return for a trial as a juvenile rather than as an adult. But that fact was raised during cross-examination by defense counsel in order to attack the juvenile's credibility; the cross-examination sought to establish that the juvenile had changed his testimony repeatedly in

---

[25]Neither defendant objected to the instructions on this issue, and the Commonwealth argues that they did not preserve the issue for appellate review. James did file a written request that contained "promise or inducement" instructions more elaborate than those given by the judge, but he did not request specifically that the judge instruct the jury that the juvenile's testimony in particular be considered with special care. We have said that where a judge rejects a request and gives an instruction that is inconsistent with a defendant's request, the requirements of Mass. R. Crim. P. 24 (b), 378 Mass. 895 (1979), are met. *Commonwealth* v. *Biancardi*, 421 Mass. 251, 253-254 (1995). Here, the instructions given were not, strictly speaking, inconsistent with those requested by James. However, "the point was brought to the judge's attention" and we conclude that the claim of "error was preserved for appellate review." *Id.* at 254. See *Commonwealth* v. *Morgan*, 422 Mass. 373, 377 (1996). Garcia did request such an instruction, but based solely on the juvenile's role as an accomplice, not on the juvenile's plea agreement with the Commonwealth. On appeal, Garcia has not raised an argument based on the instructions concerning the juvenile's role as an accomplice, and has thereby waived any such argument. See *Commonwealth* v. *Gray*, 423 Mass. 293, 296-297 (1996); Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

As to James, therefore, we consider whether it was error for the judge not to have given special instructions regarding the testimony of the juvenile. As to Garcia we consider whether the failure to give the instruction resulted in a substantial miscarriage of justice.

response to inducements that he be tried as a juvenile, rather than as an adult.

There was no reason for the jury to believe that the Commonwealth had any influence over the juvenile's testimony, nor could they have inferred that the Commonwealth was vouching for his credibility. See *Commonwealth* v. *Grenier*, 415 Mass. 680, 686-687 (1993); *Commonwealth* v. *Evans*, *supra* at 427. In these circumstances, no *Ciampa* instructions were required.

8. *Instructions on reasonable doubt.* The defendants argue that the judge's instructions on reasonable doubt were constitutionally defective because they lowered the Commonwealth's burden of proof below the standard required by the due process of law provisions of the Fifth and Fourteenth Amendments to the United States Constitution and art. 12.[26] We disagree.

The jury charge on reasonable doubt was based in part on the language of *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850),[27] instructions that have been upheld by the United States Supreme Court, *Victor* v. *Nebraska*, 511 U.S. 1, 7-17 (1994), and since *Victor*, by us, if the use of the phrase "moral certainty" "is linked with language that lends content to the phrase." *Commonwealth* v. *Pinckney*, 419 Mass. 341, 345 (1995). See *Commonwealth* v. *Latimore*, 423 Mass. 129, 140 (1996); *Commonwealth* v. *Shanahan*, 422 Mass. 631, 632 (1996). As part of the *Webster* charge, the judge here instructed that the jurors should have an "abiding conviction" that the defendants were guilty, and that "[i]t is not sufficient to establish a probability, even a strong probability, that the fact charged is more likely to be true than not true . . . ." The Supreme Court found this language sufficient "to alleviate any concerns that the phrase moral uncertainty might be misunderstood in the abstract." *Victor, supra* at

---

[26]Because neither defendant objected to these instructions, we consider whether any error created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Grant*, 418 Mass. 76, 84-85 (1994); *Commonwealth* v. *Skinner*, 408 Mass. 88, 92 (1990).

[27]In *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850), reasonable doubt was described by Chief Justice Lemuel Shaw as "the state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge."

21. Moreover, in this case the moral certainty standard was not linked in any respect with examples from everyday life, which we have noted tend to lessen the degree of certainty required to an unconstitutional level. See *Commonwealth* v. *Bonds, ante* 698 (1997); *Commonwealth* v. *Ferreira,* 373 Mass. 116, 129-130 (1977).

In this case the judge repeated almost verbatim the instructions that he had given to the jury in *Commonwealth* v. *Mack,* 423 Mass. 288, 291 (1996),[28] which we commended. The defendants argue that following his references to "mathematical certainty," the judge should have made immediately clear that reasonable doubt is equivalent to "near certitude." There is no such requirement. We repeat that "we do not require that judges use any particular words to instruct the jury." *Id.* When reviewing a jury instruction defining reasonable doubt, "the constitutional question is 'whether there is a reasonable likelihood that the jury understood the instructions to allow conviction on proof insufficient to meet the [*In re Winship,* 397 U.S. 358 (1970)] standard.' " *Commonwealth* v. *Pinckney, supra* at 342, quoting *Holland* v. *United States,* 348 U.S. 121, 140 (1954). There is no suggestion that they did not listen attentively to the judge's instructions[29] and did not understand that a high degree of certainty was required before the jury could find the defendants guilty of the crimes for which they were charged. We see no reason why we should deviate from our ruling in *Mack.*

9. *Instructions on voluntary intoxication.* The defendants claim that the judge's instructions on voluntary intoxication were erroneous because they did not adequately discuss the relationship between the specific criminal intent needed to

[28]In *Commonwealth* v. *Mack,* 423 Mass. 288, 290 n.5 (1996), in addition to the *Webster* charge the judge instructed the jury in part as follows: "[T]he Commonwealth is not required to prove the case to an absolute certainty. The Commonwealth is not required to prove the case to a mathematical certainty. Mathematical certainty is that level of certainty that you will have if you add two and two and arrive at four. The Commonwealth is not required to prove its case to an absolute or mathematical certainty, but it must prove each and every element of the charge beyond a reasonable doubt."

[29]The judge alerted the jury to the fact that the *Webster* instruction was first articulated in the Nineteenth Century and invited them to be peculiarly attentive to the language, informing them: "The language is a little bit stilted, somewhat stilted, so be attentive if you will."

prove certain of the charges and intoxication.[30] There was evidence that the defendants were part of a group that had consumed several bottles of beer before they attacked Harbour, and that James was one of those who had participated in a beer-drinking contest shortly before the killing. There was no evidence that suggested that either defendant was or appeared to have been impaired to any degree by alcohol. Voluntary intoxication instructions are not required where the evidence does not suggest a condition of "debilitating intoxication" that could support a reasonable doubt as to whether a defendant was capable of forming the requisite criminal intent. *Commonwealth* v. *Morgan*, 422 Mass. 373, 377 (1996). *Commonwealth* v. *Herbert*, 421 Mass. 307, 316 (1995).

Here, the judge gave an intoxication instruction even though the fact that James and Garcia had consumed some quantity of beer prior to the killing did not support a reasonable inference that they were so intoxicated at the time of the killing that they could not form the requisite criminal intent.[31] Even if we were to conclude, which we do not, that voluntary intoxication instructions were required in this case, "[a]ll that we have ever required be said to juries about the effect of [alcohol] consumption on a defendant's intent or knowledge would be satisfied by a simple instruction that the jury may consider credible evidence of the effects of the defendant's consumption of [alcohol] in deciding whether the Com-

---

[30]Neither defendant objected to these instructions, and the Commonwealth argues that the defendants failed to preserve their appellate rights. Garcia did request an additional instruction that intoxication could reduce the degree of culpability from murder in the first degree to manslaughter. The judge denied the request, reasoning that the evidence did not in any event warrant intoxication instructions. Appellate rights are properly preserved when a specific instruction has been requested and rejected by the judge. *Commonwealth* v. *Biancardi, supra* at 253-254. While Garcia's rejected request was not directly on point, in light of the judge's view that no intoxication instructions were needed in any case, a more tailored request may well have been denied. As to Garcia, therefore, we consider the issue on the merits. With respect to James, we consider whether any error gave rise to a substantial likelihood of a miscarriage of justice. We conclude that the instructions withstand scrutiny under either standard.

[31]At trial the defendants relied primarily on alibi defenses, and the issue of intoxication was never raised. The theory on which a case is tried below cannot be changed on appeal. *Commonwealth* v. *Fano*, 400 Mass. 296, 306 (1987), and cases cited.

monwealth had met its burden of proving the defendant's state of mind beyond a reasonable doubt." *Commonwealth* v. *Sires,* 413 Mass. 292, 300 (1992). We are satisfied that the judge fulfilled this requirement by instructing the jury several times that they could take into account the effects of alcohol on the defendants' states of mind. There was no error, and no substantial likelihood of a miscarriage of justice.

10. *Instructions on extreme atrocity or cruelty.* Relying on *Commonwealth* v. *Hunter,* 416 Mass. 831, 837 (1994), James argues that the judge's instructions on extreme atrocity or cruelty were unconstitutionally vague because he failed to limit the jury's discretion to consideration of the factors delineated in *Commonwealth* v. *Cunneen,* 389 Mass. 216, 227 (1983).[32] There, we wrote that in determining whether a murder was committed with extreme atrocity or cruelty, a jury may consider seven factors.[33] Subsequently, in *Commonwealth* v. *Hunter, supra* at 837, we stated, in dictum, that evidence of at least one of the *Cunneen* factors must be found as a prerequisite to a finding of murder with extreme atrocity of cruelty.[34] We have since decided that the *Hunter* rule is not to be applied retroactively. *Commonwealth* v. *Semedo,* 422 Mass. 716, 726 (1996).

In this case, the judge instructed the jury that they could consider the seven *Cunneen* factors for murder with extreme atrocity or cruelty, but, as the judge instructed in *Hunter,* he added that "extreme atrocity or cruelty is not limited to cases with such evidence." Although this latter component of the charge was in violation of *Hunter,* the trial was completed

[32]Garcia was not convicted of murder with extreme atrocity or cruelty. Because James failed to raise any objection to this portion of the jury charge, we review the instruction for an error which creates a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Grant, supra. Commonwealth* v. *Skinner, supra.*

[33]These factors include whether (1) there is evidence of indifference to or taking pleasure in the victim's suffering, (2) the consciousness and degree of suffering of the victim, (3) the extent of physical injuries, (4) the number of blows, (5) the manner and force with which they were delivered, (6) the instrument employed, and (7) the disproportion between the means needed to cause death and those employed. *Commonwealth* v. *Cunneen,* 389 Mass. 216, 227 (1983).

[34]In *Commonwealth* v. *Hunter,* 416 Mass. 831, 836-837 (1994), during the charge on murder with extreme atrocity or cruelty, the trial judge first instructed the jury on the *Cunneen* factors, but then stated that, "extreme atrocity or cruelty is not limited to such cases of such evidence."

two years prior to our ruling in *Hunter,* and is not subject to our ruling in that case. *Semedo, supra.*

Moreover, there was compelling evidence of the cruelty and brutality of the killing of the victim, and we cannot imagine that in this case the jury did not find at least one, if not all, of the *Cunneen* factors. We conclude that there is no substantial likelihood of a miscarriage of justice requiring reversal on the basis of the instructions on extreme atrocity of cruelty. See *Commonwealth* v. *Kosilek,* 423 Mass. 449, 456 (1996) (where "jury found the defendant guilty on the theory of premeditated and deliberate murder, as well as extreme atrocity or cruelty, it is highly unlikely that the defendant was prejudiced by the instruction"); *Commonwealth* v. *Semedo, supra* at 726.

11. *Relief under G. L. c. 278, § 33E.* In accordance with our statutory obligations, we have considered the record as a whole. We have determined that there is no reason to exercise our power under G. L. c. 278, § 33E, either to order a new trial or to reduce the verdict to murder in the second degree or manslaughter. The defendants were convicted of vicious crimes in an admirably conducted trial. The convictions will stand.

*Judgments affirmed.*