## Commonwealth *vs.* Ryan J. Burgess.

Plymouth. April 6, 2001. - June 13, 2001.

Present: Marshall, C.J., Spina, Cowin, Sosman, & Cordy, JJ.

*Constitutional Law,* Search and seizure, Admissions and confessions, Assistance of counsel. *Search and Seizure,* Consent. *Practice, Criminal,* Admissions and confessions, Voluntariness of statement, Instructions to jury, Assistance of counsel, Capital case. *Evidence,* Admissions and confessions, Intent. *Intent. Intoxication. Homicide. Burglary.*

At a hearing on a criminal defendant's motion to suppress evidence seized by the police from his bedroom, the judge correctly concluded that the defendant had freely and voluntarily consented to the search, and the judge did not err, based on the totality of the circumstances, in denying the motion to suppress. [309-311]

The record of a hearing on a defendant's motion to suppress statements made to the police while being transported in a cruiser to the State police barracks amply supported the judge's conclusions that the content of the Miranda warnings had been adequately conveyed to the defendant, that the defendant voluntarily agreed to accompany the police to the barracks, and that the defendant's statements and waiver of his rights were voluntary. [311-313]

A criminal defendant failed to demonstrate any basis on which to suppress his confession. [313-315]

At the trial of indictments charging murder with extreme atrocity or cruelty, murder with deliberate premeditation, and armed robbery, the judge properly instructed the jury regarding their consideration of the defendant's drug and alcohol consumption in determining whether he had the requisite mental state to commit the crimes charged. [315-317]

No ineffective assistance of counsel was demonstrated on appeal from a conviction of murder in the first degree where certain claims of ineffective assistance were not properly before this court, and absent a showing that the defendant's own testimony would have materially assisted the defense. [317-318]

This court declined to exercise its authority pursuant to G. L. c. 278, § 33E, to reduce a murder verdict. [318-319]

Indictments found and returned in the Superior Court Department on January 22, 1997.

A pretrial motion to suppress evidence was heard by *Patrick F. Brady,* J., and the cases were tried before *Barbara A. Dortch-Okara,* J.

*James E. Methe* for the defendant.

*Kelly-Anne DeFao*, Assistant District Attorney, for the Commonwealth.

MARSHALL, C.J. After a jury trial, the defendant was convicted of murder in the first degree on theories of extreme atrocity or cruelty and felony-murder. He was also convicted of armed burglary, the underlying felony. The defendant appeals from his convictions, claiming constitutional error in the admission in evidence of his clothing taken during a search that he maintains was unlawful; in the denial of his motion to suppress inculpatory statements made to the police while he was in custody; in jury instructions concerning his intoxication on the night of the killing; and in his claim of inadequate representation by trial counsel. The defendant also asks us to exercise our power under G. L. c. 278, § 33E, to reduce the verdict. We affirm the convictions, and decline to exercise our statutory power.

1. *Background.* On the night of December 31, 1996, the defendant broke into the home of the victim, and brutally strangled and stabbed her to death. We recount the relevant facts leading up to the killing, reserving discussion of other facts in conjunction with the issues raised. On the evening in question, the defendant attended a New Year's Eve party in Middleborough. Between 7 P.M. and 9 P.M., the defendant drank approximately ten twelve-ounce beers and two "shots" of Goldschlager (an alcoholic drink). He also ingested a tablet of Tylenol with codeine. The defendant left the party on his own shortly after 9 P.M., after an argument with the party's host.

After walking some distance, the defendant approached the home of the victim's parents where the victim was staying during her school holiday. He entered the back porch of the house through an unlocked storm door after seeing an automobile pull out of the driveway. When the victim came to the door and inquired what the defendant was doing, the defendant told her that he was a friend of her sister. The victim then began to scream.

The defendant entered the home and began to choke the victim. The victim fell back onto a couch as she pushed the defendant away. As the victim struggled to breathe, the defendant retrieved a large knife from the kitchen. When the

victim tried to escape, the defendant "stalked" her, and stabbed her repeatedly in the neck, back, and hands. After the victim fell to the floor, the defendant dragged her body so that it would be out of view of the windows, then had intercourse with her, ejaculating on himself. The evidence was inconclusive as to whether the victim was dead or alive at the time.

The defendant then went upstairs, "ransacked" three bedrooms, and smoked a cigarette. He fled when he heard the victim's family return home. He discarded the knife while running through the woods to the Middleborough home of a friend with whom he had been living for the two months prior to the killing. The police found him there the following morning.

A subsequent autopsy revealed that the victim was stabbed more than twenty-one times in her neck and back; eleven of the wounds were fatal. She received multiple abrasions and bruises to her neck, a fractured hyoid bone, and suffered hemorrhaging in her voice box, larynx, and neck muscles. Several stab wounds to the victim's hands and wrists indicated that she had tried to defend herself. There was a bite wound on one of her nipples.

2. *Motions to suppress.* Prior to trial, the defendant filed motions to suppress clothing seized by the police from his bedroom, and to suppress statements that he made to the police the day after the murder while in a cruiser and at the State police barracks. The defendant claims in essence that, because he was young (he was eighteen years of age at the time), had a history of substance abuse, had a limited education (eighth grade), and was not living with and did not have the support of his family, he was overwhelmed by the presence of the several police officers who came to question him the morning after the murder such that all of his interactions with the police that day are constitutionally suspect. After a pretrial evidentiary hearing at which three police officers and the father of the friend with whom he was living testified, a motion judge made careful factual findings with respect to each of the defendant's claims. On the basis of those findings, he determined that the defendant's clothing and statements to the police were admissible. We address each ruling in turn.

(a) *Search of the defendant's room.* On the morning after the murder, three State troopers and a Middleborough police detec-

tive arrived at the home where the defendant was living after they learned that the defendant had left the New Year's Eve party on his own. The mother of the defendant's friend let the troopers into the home. The defendant was in the shower. When he emerged, one of the officers asked him about fresh cuts and scratches on his face and about the clothing he had worn the previous night. The officer also asked to see his clothing. The defendant agreed, leading the officers to his bedroom. He held up pants that were wet and apparently bloodstained. He also retrieved a pair of athletic shoes from under his bed. These too were wet. The defendant agreed that the police could take the clothes.[1]

The defendant maintains that he was coerced into consenting to the search. Where, as here, the Commonwealth relies on consent to justify the lawfulness of a search without a warrant, it bears the burden of proving that the consent was "freely and voluntarily" given. *Commonwealth* v. *Krisco Corp.*, 421 Mass. 37, 46 (1995). The Commonwealth must show "consent unfettered by coercion, express or implied, and also something more than mere 'acquiescence to a claim of lawful authority.' " *Commonwealth* v. *Sanna*, 424 Mass. 92, 97 (1997), quoting *Commonwealth* v. *Voisine*, 414 Mass. 772, 783 (1993). The motion judge's conclusion that the Commonwealth had met its burden is unassailable. His rulings that the "police behavior at the house was appropriate and professional," that the police "were not coercive," that the defendant "appeared cooperative," and that the police "did not employ trickery or deceit" were fully supported by the testimony at the hearing.[2] The judge took into account the defendant's age and his level of education. See *Commonwealth* v. *Sarourt Nom*, 426 Mass. 152, 158 (1997) (no suppression where defendant was "high school dropout"). He

---

[1]The police stacked the clothes on a chair in the bedroom but did not remove them at that time. Later that morning, while at the police barracks, the defendant was read and signed a consent form allowing the police to retrieve his clothing from the residence. That evening the officers returned to the residence with a search warrant to retrieve the clothing.

[2]The judge found that, while the defendant was still in the shower, the friend's father shouted to the defendant that "someone was there to see him." One of the State troopers immediately interjected and informed the defendant that the police were there to speak to him.

also considered that the officers did not affirmatively inform the defendant that he could withhold consent to the search or questioning. See *Commonwealth* v. *Sanna, supra* at 97-98 n.10 (failure to inform of right to withhold consent relevant but not necessarily dispositive). Based on the totality of the circumstances, the judge did not err in denying the motion to suppress the admission of clothing in evidence. See *Commonwealth* v. *Parker,* 402 Mass. 333, 342 (1988).

(b) *Statements made in the police cruiser.* The house where the defendant was living at the time of the murder is located a short distance from the State police barracks. The motion judge found that, while in a cruiser heading to the barracks, the defendant received "complete and accurate" Miranda warnings. During the ride the defendant admitted that he had entered the victim's home the previous night, and (in response to a comment by one of the officers) agreed that someone in the house had "led [him] on," and that he had later fled and had run out into the woods.[3] The defendant claims it was error for the motion judge to deny the motion in two respects. First, he claims the judge failed to take into account that the officers would not have had time during the brief journey both to advise him of his Miranda rights and to interrogate him. Second, he suggests that the judge erroneously credited the testimony of the police officers regarding the fact of and content of the Miranda warnings.[4] There is no merit to either claim.

---

[3]While in the cruiser one of the State troopers informed the defendant that the officers knew what had happened the previous night. The defendant responded that he did not know what the trooper was talking about. The judge found that the trooper then asked whether the defendant might have entered a house on Old Center Street just to get warm; the defendant denied this. He then suggested to the defendant that he went into the victim's house to get warm, that he might even have been invited in, that something happened, and that "maybe somebody even led you on when you were inside that house." The defendant responded, "Yeah, she led me on." At that point, the cruiser approached the State police barracks. The trooper pressed the issue, suggesting to the defendant that something "bad" happened inside the house, that someone came home, and that something caused the defendant to run. The defendant responded that he did indeed run out of the house and into the woods.

[4]The defendant points to conflicting testimony offered by two troopers at the hearing on the motion to suppress concerning the exact wording of the Miranda warnings. He also points out that one of the troopers offered conflict-

The motion judge's findings and decision are amply supported by the evidence. See *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990), quoting *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980) (determination of weight and credibility of testimony "is the function and responsibility of the judge who saw the witnesses," not appellate court). Minor variations in the trooper's accounts of the exact language he used when giving the Miranda warnings, see note 4, *supra*, do not require suppression where the judge found that the content of the Miranda warnings had been adequately conveyed. See *Commonwealth* v. *Sanna*, *supra*; *Commonwealth* v. *Ghee*, 414 Mass. 313, 318 (1993).

The defendant's claim that, even if the warnings were adequate, his waiver was not valid because the police used coercive "psychological pressures" before he entered the cruiser, is equally unavailing. The evidence supports the judge's finding that the defendant voluntarily agreed to talk to the police, and to accompany the officers to the barracks.[5] The defendant was not handcuffed, and the judge found he was "coherent, sober, and was communicating with no problem." See *Commonwealth* v. *Raymond*, 424 Mass. 382, 396 (1997). The defendant had also received Miranda warnings three years earlier when, faced with a burglary charge, he was questioned by police. See *Commonwealth* v. *Pucillo*, 427 Mass. 108, 111 (1998). There is no suggestion that the police used any unfair tactics to induce the defendant to waive his rights. See *id.* The Commonwealth met its burden.

The judge's findings also support his conclusion that the defendant's statements in the cruiser (in addition to his waiver)

ing testimony at the hearing and at trial regarding the language he used in reciting the Miranda rights in the cruiser, and that, when he testified at the motion hearing, the trooper had difficulty remembering whether the defendant acknowledged that he understood his rights.

[5]The motion judge found that after the defendant showed the police officers the clothes he wore the night of the killing, one of the troopers told the defendant that "[w]e have to talk." The defendant stated that he was willing to do so. The trooper then said that they could conduct the interview at the home where the defendant was living or at the police barracks, and informed the defendant that he was not required to go to the police barracks with the officers. The defendant nevertheless agreed to accompany the officers to the barracks.

were voluntary. See *Commonwealth* v. *Pucillo, supra* at 111 n.1, quoting *Commonwealth* v. *Edwards*, 420 Mass. 666, 673 (1995) (although voluntariness of waiver and voluntariness of statements are distinct issues, both are determined in light of totality of circumstances and share many of same factors). While the officers did make suggestions that led to the defendant's admissions, see note 3, *supra*, there were no threats or attempts to deceive the defendant. See *Commonwealth* v. *Silva*, 388 Mass. 495, 503 (1983), and cases cited. The statements were properly admitted.

(c) *Statements at the police barracks.* Although the officers had already apprised the defendant of his Miranda rights while in the cruiser, after arriving at the State police barracks they repeated the warnings, not once but twice. The defendant again acknowledged that he understood his rights and signed two pre-printed Miranda forms.[6] The officers then interviewed the defendant for approximately forty-five minutes. The defendant described the events of the previous evening, including details of the murder. At a certain point in his narrative, the defendant stated, "I killed her," and began to cry. He told the officers that he did not think that he could continue. At the hearing on the motion to suppress, an officer testified that he told the defendant that, in his opinion, "it would do him personally good to continue and to get it off of his chest." The defendant then continued his narrative.

The defendant concedes that he received adequate Miranda warnings before his interview at the police barracks commenced, but he maintains that his statements nevertheless were not voluntary. The motion judge rejected that claim. He found that the defendant's demeanor was cooperative throughout the entire interview; that the defendant was aware of the seriousness of the interrogation; that he gave appropriate answers to the ques-

---

[6]One officer testified that, at the barracks, he read the Miranda rights to the defendant a second time because the first form from which he read was deficient: it did not indicate that the defendant could stop answering questions at any time. The second form was complete. It also contained questions to ascertain whether the defendant was under the influence of alcohol or suffering from a mental disorder, and whether the defendant understood the questions posed to him.

tions; and that he was not under the influence of drugs or alcohol.

The defendant was not subjected to "the sort of coercion that would override [his] will . . . and render his confession involuntary." *Commonwealth* v. *Raymond, supra* at 396. The officer's encouragement to the defendant "to get it off his chest" was not improper: an officer may suggest "broadly" that it would be "better" for a suspect to tell the truth. *Commonwealth* v. *Meehan*, 377 Mass. 552, 564 (1979), cert. dismissed, 445 U.S. 39 (1980), and cases cited. See *Commonwealth* v. *Souza*, 428 Mass. 478, 482 (1998); *Commonwealth* v. *Raymond, supra*. No officer gave any hint or assurance that, by confessing, the defendant could anticipate or would receive any favorable treatment from the Commonwealth. See *Commonwealth* v. *Meehan*, *supra*; *Commonwealth* v. *Raymond, supra* at 395-396. There was no basis to suppress the defendant's confession.

Videotape recording equipment was available for use at the police barracks, but one of the interrogating officers made an affirmative decision not to use it while the defendant was being questioned. The defendant argues that, on this basis, suppression of his confession is warranted. As recently as 1999, we explained that the electronic recording of interrogations is helpful, and that a fact finder may take into account the failure of the police to record a suspect's statements in determining their voluntariness. But there is no requirement that statements that are not recorded be suppressed in all cases. See *Commonwealth* v. *Larkin*, 429 Mass. 426, 438 n.10 (1999); *Commonwealth* v. *Diaz*, 422 Mass. 269, 273 (1996); *Commonwealth* v. *Fryar*, 414 Mass. 732, 742 n.8 (1993), *S.C.*, 425 Mass. 237, cert. denied, 522 U.S. 1033 (1997). The motion judge appropriately considered the failure of the police to record the defendant's interview as one of several factors bearing on the voluntariness of the defendant's inculpatory statements. There was no error.

At trial, although not requested by the defendant, the trial judge (who was not the motion judge) twice instructed the jury on the Commonwealth's burden to prove beyond a reasonable doubt that any statements to the police were made "voluntarily, freely, and rationally." See *Commonwealth* v. *Tavares*, 385 Mass. 140, 152, cert. denied, 457 U.S. 1137 (1982). She also

instructed the jury on their responsibility to disregard the statements of the defendant if the Commonwealth did not meet its burden.[7] *Id.* Before and during trial, the defendant challenged the voluntariness of the waiver of his Miranda rights, his consent to search his bedroom, and his statements to the police. First the motion judge, for well-explained reasons, and then the jury rejected his claims. The defendant's constitutional rights were fully protected.

3. *Jury instructions.* The defendant's intoxication on the night of the murder, and his ability to form the requisite intent to commit the crimes for which he was indicted, were key to his defense. He claims that the judge did not adequately instruct the jury that they could consider the defendant's intoxication and use of drugs in determining whether he could have formed the requisite intent to commit (a) murder with extreme atrocity or cruelty and (b) armed burglary. He draws a distinction between the intoxication instruction on murder with deliberate premeditation and the intoxication instructions on these other two crimes. The claim has no merit.

The judge instructed the jury on four separate occasions that they could take into account the defendant's drug and alcohol consumption in determining whether he had the requisite mental state to commit the crimes for which he was charged. Immediately after describing the requisite intent for premeditated murder, but before describing the elements of malice, the judge gave a comprehensive intoxication instruction.[8] She gave a

[7]The judge gave a thorough "humane practice" instruction after defense counsel objected to police testimony concerning the defendant's statements at the State police barracks. She repeated the first portion of that instruction during her jury charge.

[8]She instructed as follows: "You may consider the defendant's mental state on the night in question including any voluntary consumption of alcohol or drugs in determining whether or not the Commonwealth has proven beyond a reasonable doubt that [the defendant] acted with deliberate premeditation. You may use the evidence that you accept as true on the issue of whether the defendant had the required mental state to deliberately premeditate." She further informed the jury that she would repeat that instruction later in her charge "because it relates to a number of different elements that must be proven in this case," noting that the "evidence of the consumption of alcohol and/or drugs may relate to any number of the elements, or the proof of any number of the elements of this case."

similar instruction after defining the malice element of premeditated murder. Turning to the instructions on murder with extreme atrocity or cruelty, after defining the elements of that crime, the judge gave a third instruction on intoxication, specifically linking the defendant's use of drugs and alcohol to the requisite intent element of that crime. The judge gave a fourth and final instruction on intoxication after instructing the jury on the elements of armed burglary.

At trial, the defendant did not object to the instructions, and we review them to determine whether there was error, and, if so, whether there was a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *James*, 424 Mass. 770, 789-790 (1997). Read as a whole, the instructions did not create any error. When a judge instructs a jury about the relationship between intoxication and a specific intent crime, all that is required is an "instruction that the jury may consider . . . the defendant's consumption of [alcohol or drugs or both] in deciding whether the Commonwealth had met its burden of proving the defendant's state of mind beyond a reasonable doubt." *Id.*, quoting *Commonwealth* v. *Sires*, 413 Mass. 292, 300 (1992). See *Commonwealth* v. *Murphy*, 426 Mass. 395, 400 (1998) (instruction on intoxication immediately following instructions on extreme atrocity or cruelty "adequate"). It was proper — and probably helpful to the jury — for the judge to give an intoxication instruction immediately after discussing the premeditation element of premeditated murder, as well as after defining malice. Although she did not repeat that same pattern instruction when it came to instructing on murder with extreme atrocity or cruelty, she did give an instruction on intoxication immediately after instructing on the elements of murder with extreme atrocity or cruelty, and added later that "voluntary intoxication is one factor among all of the other circumstances which you may consider on the question of whether the defendant . . . in fact acted with malice aforethought, deliberate premeditation, extreme atrocity or cruelty, or specific intent to commit any of the crimes that I have mentioned that require

specific intent . . . ."⁹ This was adequate.

The judge was also not required to give an instruction on intoxication immediately following her instruction on the specific intent element of armed burglary. See *Commonwealth v. James, supra.* In her fourth and final instruction on intoxication, she specifically mentioned "the burglary indictment" just prior to informing the jury for the fourth time that they could take into account the defendant's consumption of alcohol and drugs in assessing whether the defendant had the requisite specific intent to commit the crimes for which he was charged. Combined with her earlier description of the specific intent element of armed burglary, the instructions were sufficient to inform the jury that they could take into account the defendant's ingestion of drugs and alcohol in determining whether he had formed the requisite intent to commit armed burglary.

4. *Ineffective assistance of counsel.* The defendant maintains that four errors by his trial counsel denied him effective assistance, in violation of his rights under art. 12 of the Massachusetts Declaration of Rights and the Sixth Amendment to the United States Constitution. He asserts that his trial counsel should have (1) called to testify at trial several of his friends who testified before the grand jury that the defendant was "drunk" on the night of the murder; (2) called an expert witness at the hearing on his motion to suppress to testify that, in the totality of the circumstances, the defendant's statements to the police in the cruiser and barracks could not have been voluntary; (3) ensured that the only defense witness to testify at trial, a forensic pathologist, had previously interviewed the defendant, his friends, and family about the defendant's drinking habits and consumption of alcohol and drugs on the night of the murder; and (4) called the defendant to testify at the motion hearing to contradict the police account of the statements he made in the police cruiser and barracks.

Because the first three claims require additional fact-finding and thus require a reviewing court to look beyond the record on

⁹The judge further diminished any juror confusion by referring the jury to her first two instructions on intoxication, in which she had linked intoxication and the specific intent elements of premeditated murder.

appeal, they are not properly before us, and we therefore do not consider whether they have any merit.[10] See *Commonwealth* v. *Waite*, 422 Mass. 792, 807 (1996). The defendant may raise those claims on a motion for a new trial to be considered by the trial judge who is "better equipped to conduct any necessary evidentiary hearings." *Id.*

As his fourth claim, the defendant asserts that he should have been called to testify at the motion hearing to contradict the testimony of the police officers. Because the defendant submitted an affidavit to the motion judge that contradicted the police account of what was said in the cruiser and at the barracks, we address that claim. We conclude that this tactical decision of trial counsel not to call the defendant created no substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Freeman*, 430 Mass. 111, 120 (1999), and cases cited. Had the defendant testified, he would have been subjected to potentially damaging cross-examination. Counsel's choice not to call the defendant will not be gainsaid absent a showing that the defendant's own testimony would have materially assisted the defense. See *Commonwealth* v. *Nerette*, 432 Mass. 534, 539 (2000), citing *Commonwealth* v. *Millyan*, 399 Mass. 171, 181 (1987).

5. *Review under G. L. c. 278, § 33E.* The defendant requests that we exercise our power under G. L. c. 278, § 33E, to reduce the murder verdict. He asks us to take into account his young age, his lack of education, and absence of any support by his family at the time of the murder, as well as evidence that he drank heavily and used drugs before he committed the crime. Relying on *Commonwealth* v. *Williams*, 364 Mass. 145, 152 (1973), he suggests that we should reduce the verdict to murder in the second degree because the circumstances that led to the murder "reflected spontaneity and a rapid sequence of events."

[10]The defendant's first claim likely will require the reviewing court to examine the complete testimony of several grand jury witnesses. Additional fact finding is also required to resolve his second and third claims of error: the defendant has not submitted an affidavit identifying an expert witness who would have been willing to testify concerning the voluntariness of the defendant's statements to the police, nor has he supplied an affidavit to support his claim that any family members or friends could have informed the expert about his drinking habits or history of treatment for substance abuse.

He notes that he brought no weapon to the victim's house, and that he reacted with violence only when discovered by the victim. We see no reason to reduce the verdict. This was a random, brutal crime. The Commonwealth presented overwhelming evidence that the defendant strangled the victim, stalked her, stabbed her repeatedly, and sexually assaulted her, without knowing whether she was dead or alive. The defendant had sufficient presence of mind to leave the murder scene when he thought he might be discovered, and to dispose of the murder weapon, undermining his claim of uncomprehending intoxication. We decline to exercise our authority pursuant to G. L. c. 278, § 33E.

*Judgments affirmed.*