Agnes, A.J.
The defendant is charged with trafficking in cocaine, a class B controlled substance, with a net weight in excess of 14 grams in violation of G.L.c. 94C, §32E. The defendant has filed a motion to suppress statements and physical evidence seized by the Lawrence Drug Task Force comprised of federal, state and local law enforcement authorities on grounds that while in custody he was subjected to custodial interrogation without first having made a valid waiver of his Miranda rights, and that he did not voluntarily consent to a search of his apartment.
Based on the credible evidence and exhibits presented at the hearing on the defendant’s motion, I make the following findings and rulings.
STATEMENT OF FACTS
On April 20, 2000, Special Agent Gregory Willoby of the United States Drug Enforcement Administration was working with the Lawrence Drug Task Force of the Essex County District Attorney’s Office. At approximately 6:30 p.m. on that date S.A. Willoby arrested Adolfo Gonzales for selling eleven ounces of cocaine to an undercover police officer in Methuen, Massachusetts. Mr. Gonzales expressed a strong interest in cooperating with law enforcement authorities. He told the police that he got 4 of the 11 ounces from a skinny Dominican male (nicknamed “Flako”) who shaved it off of a kilo quantify brick of cocaine. Mr. Gonzales told the police that this supplier lived in an apartment with his wife and child and that he was scheduled to meet his supplier later that evening to pay him for the cocaine ($5,700), and would bring the police to him. Mr. Gonzales brought the police to 360 South Union Street in Lawrence and pointed out the location of the defendant Jose Gomez’s apartment. Mr. Gonzales also pointed out a gray Honda automobile parked on the street in the vicinity of the apartment as belonging to the defendant.
The police conducted a motor'vehicle check and learned that the Honda was registered to Mary Blackly of Methuen. Mr. Gonzales had two different telephone numbers for the defendant and planned to telephone him and then point him out to the police. However, before any telephone call was made, the defendant walked out of his apartment. He walked over to a Jeep Cherokee motor vehicle, then crossed the street to the parked Honda automobile. At this pont, Mr. Gonzales said “that’s Flako.” A group of police officers closed in on the defendant and identified themselves as police officers. They asked him who he was (“Jose Gomez”), where he lived (“47 Cypress Street”), and where he was coming from. The defendant did not reply to the third question. The police asked the defendant who lived in the apartment he had just left. The defendant replied, “a friend.” Soon thereafter, the defendant said, “I do live at 360 Washington Street with my girlfriend and baby.” The police told the defendant that Mr. Gonzales had informed them that there was a kilo of cocaine in his apartment. At the time of this conversation, the defendant was on the street. He was surrounded by at least four police officers. He was not free to go.
The police escorted the defendant to an unmarked police cruiser and put him in the back seat. The defendant was placed in handcuffs. They told him he faced serious charges, and asked him for the keys to his apartment. The police did not state that he had a right to refuse to consent to any search. The defendant complied and turned over the keys. The police used one key to gain entry to the apartment building from the street and walked upstairs to the defendant’s apartment. The police knocked on the apartment door. They did not announce their presence as police officers. There was no answer. The police used a second key to open the inside door to the defendant’s apartment. As the key was being turned, a female, later identified as Mary Blakeney partially opened the door and said “who is it?” The police identified themselves. Ms. Blakeney stated “you can’t come in without a warrant.” She asked the police to leave. The police opened the door and entered.
There was an infant in a crib. The police told her that the defendant was downstairs under arrest. Ms. Blakeney said she didn’t live there. Then, she said she did live there with her boyfriend and her baby. The police advised her she was free to leave or remain. She chose to stay.
Special Agent Willoby returned downstairs to the defendant while several other police officers remained upstairs in his apartment. The defendant was still in handcuffs inside the police cruiser. S.A. Willoby informed him of his Miranda rights by reading from a printed card. The defendant said he spoke English and understood his rights. The police informed the defendant that they were going to obtain a search warrant. They indicated that a warrant was a time consuming procedure, it was already late, and if they obtained a warrant, his girlfriend would be arrested and the police would be required to take custody of the baby and turn *443 it over to shelter or the Department of Social Services. The police informed him that if his girlfriend was arrested, both she and the child could be endangered. They further stated that if a search warrant was used the apartment would be turned upside down. The police also stated that if he consented to the search, there would be no need to arrest his girlfriend or to take the baby. The defendant was very concerned about the well being of his girlfriend and his child. At this point, the defendant said I’ll give you written consent.
Following this conversation, the police escorted the defendant up to his apartment. He was in handcuffs. The police seated him at his kitchen table along with his girlfriend and the police. She advised him not to sign any consent form. Eventually, a form was procured and the defendant signed it. See exhibit 1.
A search of the defendant’s bedroom followed. A large quantity of cocaine (700-800 grams) was found inside a brown bag and in a protein supplement container next to a bureau, along with a scale and documents. During this encounter, the defendant’s girlfriend produced a license and provided the police with her social security number. As she was removing her wallet from her handbag, the police noticed a blue key inside her bag. They asked her about it. She stated that she had opened a safe deposit box in her name for the defendant. She indicated that she wasn’t sure about how much money was inside it, but estimated the amount as $25,000. The police took the key and asked her about the location of the bank. The defendant encouraged her to tell the police what they wanted to know. Eventually, she was able to identify the bank and with her cooperation the police obtained a search warrant and seized cash from the box in the amount of $43,000.
In addition to these specific findings of fact, I wish to make clear that I generally credit the testimony of the defendant and his girlfriend with regard to the conduct of the police in this case.
DISCUSSION
1. When the police approached the defendant as he walked to his car, they had probable cause to arrest him based on the information supplied by Mr. Gonzales. It was their intention to arrest him and to search his apartment because, as a supplier of Mr. Gonzales, they believed he was a “bigger fish." This was a entirely legitimate strategic decision on their part. However, the tactical decisions they made to subject the defendant to custodial interrogation without first obtaining a waiver of his Miranda rights and to procure his consent to a warrantless search by impermissibly exploiting his concerns for the safety of his girlfriend and his child violated settled requirements of state and federal constitutional law and require the suppression of evidence.
2. While it is true that a person may be handcuffed and placed in custody without being under arrest within the meaning of the Fourth Amendment to the Constitution of the United States and Article 14 of the Declaration of Rights, e.g., Commonwealth v. Gordon, 47 Mass.App.Ct. 825, 826-27 (1999), the police may nonetheless have an obligation to administer Miranda warnings and to secure a valid waiver of the defendant’s Miranda rights before questioning him in such circumstances.
In determining whether custodial interrogation has occurred, several factors must be considered including the place of the interrogation, whether the police have informed the subject that he is a suspect, the nature of the questioning, and whether the subject was free to leave. Groome, supra, 435 Mass. at 211-12. See Commonwealth v. Magee, 423 Mass. 381, 385 (1996), quoting Commonwealth v. Jung, 420 Mass. 675, 688 (1995). Here, the defendant was first questioned on the street, but then quickly moved to the rear of a police cruiser. He was in handcuffs. It was unmistakable that he was a suspect and was not free to leave. The questioning was not aggressive as in Commonwealth v. Coleman, 49 Mass.App.Ct. 150 (2000), but it was designed to elicit incriminating responses.
In addition, it is relevant to consider whether the defendant was physically or mentally intimidated. In this case, the defendant’s statements were obtained in part by representations that a search of his apartment pursuant to a warrant would leave it turned upside down, and the fear that his child would be taken into state custody. See Commonwealth v. Coleman, 49 Mass.App.Ct. 150, 155 n. 9 (2000). In these circumstances, as in Gordon, supra the questioning by the police of the defendant at the scene without first administering Miranda warnings bore all the hallmarks of custodial interrogation. Contrast, Commonwealth v. Groome, 435 Mass. 201 (2001) (questioning of suspect at his place of employment, during a ride in a police cruiser and for a time while at the police station was not custodial and not governed by Miranda doctrine); Commonwealth v. Alcala, 54 Mass.App.Ct. (2002) (Miranda not applicable because there was evidence that the defendant was under arrest or was confined or handcuffed at the time of the interrogation or that the circumstances of the questioning were intimidating); Commonwealth v. Byrd, 52 Mass.App.Ct. 642 (2001) (suspect’s volunteered statements while in police custody not the product of interrogation and not subject to Miranda doctrine); Commonwealth v. Sauer, 50 Mass.App.Ct. 299 (2000) (brief on the scene questioning of suspect stopped operating a motor vehicle not governed by the Miranda doctrine). When the Commonwealth interroa defendant who is in custody, it bears the burden of demonstrating beyond a reasonable doubt the questioning was preceded by a valid waiver of *444 the defendant’s Miranda rights. The Commonwealth has not sustained that burden in this case. Accordingly, the statements made by the defendant on the street and while in the police cruiser before the police entered his apartment for the first time must be suppressed.
3. The mere fact that a person is in custody and under arrest does not preclude a finding that he voluntarily consented to a search. Commonwealth v. Franco, 419 Mass. 635, 642 (1995). However, in order for consent to be valid the Commonwealth must prove by a preponderance of the evidence that it was “unfettered by coercion, express or implied, and also something more than mere acquiescence to a claim of lawful authority.” Commonwealth v. Burgess, 434 Mass. 307, 310 (2001). In the circumstances of this case, the defendant did not consent to any search, but simply turned his keys over to the police in compliance with a show of authority by the police. In such circumstances, the Commonwealth has failed to establish valid consent. Commonwealth v. Krisco Corp., 421 Mass. 37, 46 (1995).
4. Recently, the Supreme Judicial Court reiterated “the familiar proposition that ‘(s)earches and seizures conducted outside the scope of valid warrants are presumed to be unreasonable. In such circumstances, the burden is on the Commonwealth to show that the search or seizure falls within a narrow class of permissible exceptions.’ ” Commonwealth v. Seng, 436 Mass. 537, 550 (2002), quoting Commonwealth v. Rodriguez, 378 Mass. 296 (1979). The police had no right to use the defendant’s keys to enter his apartment. The Commonwealth did not establish an exigency that compelled immediate action without obtaining a warrant or permission to enter the apartment.[1] Their conduct in doing so constituted an illegal search in violation of the defendant’s rights.
5. When the police returned to the cruiser and informed the defendant of his Miranda rights, they did not indicate whether they had entered his apartment or whether they had conducted a search. They did not explain that he could refuse to consent to a search of his apartment. They applied improper psychological pressure by telling him that his wife would be arrested[2] and his child taken into state custody if he did not consent. Notwithstanding the fact that the defendant told the police that he understood his rights, the Commonwealth has not met its burden of proving a waiver of his Miranda rights by the standard of proof beyond a reasonable doubt. Furthermore, in light of the prior illegality (unlawful seizure of the keys and unlawful entry into the defendant’s home), and the improper pressure applied to the defendant to induce him to consent, the Commonwealth has faded to meet its burden of proving valid consent for the search of the apartment. See Commonwealth v. Krisco Corp., 421 Mass. 37, 46 (1995); Commonwealth v. Harmond, 376 Mass. 557, 560-61 (1978).
6. As a result of the illegal warrantless defendant’s apartment, all the evidence seized by the police from the defendant’s apartment, including the drugs, paraphernalia, and documents, must be suppressed under the familiar doctrine of the “fruit of the poisonous tree.” Commonwealth v. DiMarzo, 431 Mass. 1012, 1013 (2002), quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963). See Commonwealth v. Marquez, 434 Mass. 370, 378-79 (2001); Commonwealth v. Fredette, 396 Mass. 455, 459 (1985); Commonwealth v. Ellsworth, 41 Mass.App.Ct. 554, 557 (1996).
7. The defendant’s motion also seeks the suppression of the contents of the safe deposit box. The first question is whether the defendant has standing to contest a search of his girlfriend. Under the doctrine of automatic standing applicable in Massachusetts when a person is charged with a possessory offense, the defendant does have standing. Commonwealth v. Amendola, 406 Mass. 592, 596-601 & n. 4 (1990). See Commonwealth v. Watson, 430 Mass. 724, 726 n. 4 (2000). The safe deposit box key and the information supplied by Mary Blakeney would not have been obtained without the illegal entry into the apartment. Based on the previous rulings set forth above, the Commonwealth has failed to establish that valid consent was given by either the defendant or his girlfriend. Even if the police had probable cause to believe the key was connected to the illegal sale of drugs, the police did not have any right to be in the apartment when they made the observations of the key as supplemented by the statements made by Ms. Blakeney. The seizure of the safe deposit key occurred only minutes after the police entered the apartment. There was no intervening event that dissipated the taint of the initial illegality. In these circumstances, the seizure of the key and the subsequent search of the box and seizure of the cash were the result of exploiting an illegal, warrantless entry and require suppression of the evidence. See Commonwealth v. Blevines, 54 Mass.App.Ct. 89, 97-98 (2002).
ORDER
For the above reasons, the defendant’s motion to suppress, as amended, is ALLOWED.

Any suggestion to the contrary is belied by the fact that the police knocked before entering and apparently were willing to let Mary Blakeney leave the premises without being searched.

I credit the testimony of Mary Blakeney that the police informed her that she was free to leave when they first entered the defendant’s apartment. Since the police already had probable cause to believe that drugs would be located in the apartment, the only reason for telling the defendant that she would be arrested if a search warrant was obtained was to apply psychological pressure on him to induce him to give them consent.