## COMMONWEALTH *vs.* ALEX MORALES.

Hampden. December 9, 2011. - April 9, 2012.

Present: IRELAND, C.J., SPINA, BOTSFORD, GANTS, & LENK, JJ.

*Practice, Criminal,* Motion to suppress, Admissions and confessions, Voluntariness of statement, Arraignment, Delay in commencement of prosecution, Argument by prosecutor, Instructions to jury, Assistance of counsel, Capital case. *Evidence,* Admissions and confessions, Voluntariness of statement. *Constitutional Law,* Admissions and confessions, Voluntariness of statement, Assistance of counsel. *Due Process of Law,* Police custody, Delay in commencement of prosecution. *Homicide. Malice. Intent.*

In a murder case, a judge properly denied the defendant's pretrial motion to suppress evidence, where, as to statements the defendant gave during an interview at the police station prior to being arrested, the judge's conclusion that the defendant was not then in custody was amply supported, and the judge correctly determined that the prearrest statements were not illegally obtained; therefore, suppression of the defendant's subsequent statements was not warranted under the "fruit of the poisonous tree" doctrine [774-776]; further, the judge correctly concluded that the defendant's second and third postarrest statements were voluntarily made [776-778].

This court concluded that suppression of statements a criminal defendant gave to police during prearrest and postarrest interviews at the police station was not warranted on the ground of unreasonable delay in arraignment, where the defendant initially went to the police station for questioning voluntarily, and where he executed a written waiver of his right after he was arrested, before giving his second statement, and before giving his third statement. [778]

This court concluded that the admission of statements made to police by a criminal defendant, to whom the police failed to convey a message from his counsel instructing him not to talk to the police, in violation of his right under art. 12 of the Massachusetts Declaration of Rights, was harmless beyond a reasonable doubt, where the jury heard evidence that prior to counsel's attempted contact, the defendant had admitted to killing the victim, explained how he had done so, and described where the victim's body would be found, making its discovery inevitable. [778-782]

At murder trial, no prejudice arose from the prosecutor's isolated misstatement of the law of deliberately premeditated murder in his closing argument, where, in view of the judge's oral and written instructions to the jury, and the strength of the Commonwealth's case, the misstatement could not possibly have made a difference in the jury's conclusions. [783-785]

This court concluded that a criminal defendant's claim of ineffective assistance of counsel, on the ground that his trial counsel failed to obtain an expert

on sleep deprivation as it related to the defendant's mental state, lacked merit, where the claim was unsupported by any affidavits and was not raised through a motion for a new trial. [785]

There was no merit to a criminal defendant's claim of ineffective assistance of counsel, on the ground that his trial counsel failed to request a jury instruction on voluntary intoxication, where the evidence, viewed in the light most favorable to the defendant, did not warrant such an instruction. [785-786]

INDICTMENTS found and returned in the Superior Court Department on January 3, 2008.

Pretrial motions to suppress evidence were heard by *C. Jeffrey Kinder*, J., and the cases were tried before him.

*Stephen Neyman* for the defendant.

*Marcia B. Julian*, Assistant District Attorney, for the Commonwealth.

IRELAND, C.J. On May 29, 2009, a jury convicted the defendant, Alex Morales, of murder in the first degree on all three theories of murder, armed robbery, and kidnapping. Represented by new counsel on appeal, the defendant argues (1) error in the denial of his motion to suppress statements and evidence; (2) ineffective assistance of counsel predicated on trial counsel's failure to (a) engage a sleep deprivation expert and (b) request a jury instruction on the effect of the defendant's intoxication relative to his intent; and (3) improper closing argument by the prosecutor. In addition, the defendant asserts that we should exercise our power under G. L. c. 278, § 33E, to reverse his murder conviction. We affirm the order denying the defendant's motion to suppress and the judgments of conviction. We discern no basis to exercise our authority under G. L. c. 278, § 33E.

1. *Motions to suppress.* Claiming various violations of both the State and Federal Constitutions, the defendant moved to suppress statements he made to police as well as evidence, including the contents of his backpack; information recovered from his cellular telephone; and various items seized from his residence pursuant to a search warrant. After an evidentiary hearing, a Superior Court judge (who was also the trial judge) denied the motions with the exception of the evidence recovered from the defendant's cellular telephone.[1] In general, "[i]n reviewing a

---

[1]The judge allowed the defendant's motion to suppress the contents of the

ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), quoting *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002). "[O]ur duty is to make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *Bostock*, 450 Mass. 616, 619 (2008), quoting *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996).

We recite the motion judge's findings of fact, occasionally supplemented with undisputed evidence from the record. All of the findings are supported by the evidence that the judge found credible, and we accept them. See *Commonwealth* v. *Sparks*, 433 Mass. 654, 656 (2001), and cases cited.

a. *Initial contact with the defendant.* Early on Saturday, December 8, 2007, the victim, Corey Lind, who delivered pizzas for a restaurant in Springfield, went missing. He was last seen on that day by fellow employees as he left the restaurant to make a delivery to 104 Arnold Avenue at about 2 or 3 A.M. When the victim did not return to the restaurant or to his home, his manager contacted the Springfield police department and reported him missing. In addition to reporting the address to which the victim was heading, the manager provided the name of the person who had placed the order, Alex Morales (defendant).

Detective Edward Cass received the missing person report at 6 P.M. that evening. He confirmed that the address of 104 Arnold Avenue did not exist and learned that the defendant, at one point, had an address of 40 Truman Circle.

Detective Cass went to the Truman Circle address at about 10 P.M. The defendant's girl friend, Deea Keeley, with whom he had at least one child, resided there; the defendant was there visiting. After identifying himself, Detective Cass asked the defendant whether he had telephoned the restaurant the night before. The defendant stated that he had made some "prank" calls to the restaurant. Detective Cass asked whether the defend-

defendant's cellular telephone because the Commonwealth did not present any evidence at the evidentiary hearing to justify its warrantless search. Because there is no contention on appeal concerning this ruling, we need not address it.

ant would be willing to accompany him to the police station to discuss the matter. The defendant agreed, and went to get his shoes and a jacket. Keeley approached Detective Cass and asked whether the defendant would need bail money. Detective Cass stated that he would not, explaining that the defendant was not in trouble and was just going to the station to talk about the telephone calls.

The defendant returned and before entering the cruiser, Detective Cass asked the defendant whether he had any weapons. The defendant replied that he had a pocket knife and started emptying out his pockets, placing the contents on the hood of the cruiser. Detective Cass observed that one of the items the defendant placed on his cruiser was a set of keys, which Detective Cass recognized as consistent with the 1993 Chevrolet Lumina automobile that the victim had been driving when he went missing. Detective Cass twice asked the defendant about the keys, but the defendant did not respond. En route to the station, there was no discussion about the victim. The defendant was friendly and cooperative.

b. *The defendant's statements to the police.* i. *The first statement.* Sometime after 11 P.M. Detectives Eugene J. Dean and Timothy O'Shea interviewed the defendant when he arrived at the station. Prior to the interview, they reviewed the missing person report and had a discussion with Detective Cass about the keys in the defendant's possession. In the interview room, the defendant was not handcuffed or otherwise restrained, and was not under arrest. When the detectives asked the defendant about the prank call to the restaurant, he described it as a "goof." They then asked the defendant about the automobile keys in his possession and explained that Detective Cass was going to check the keys to determine whether they fit the Lumina driven by the victim. The defendant then sunk into his chair and admitted that he had found the automobile, drove it around, and left it in the area of a "senior living center" in Springfield. The detectives told the defendant that they wanted to stop the interview in order to advise him of his Miranda rights and video record any further questioning. The defendant agreed.

As reflected on the video recording, before administering the Miranda warnings, the detectives asked the defendant some

general biographical questions. The defendant confirmed that he could read and write English, that he had no psychological problems, and was not under the influence of drugs or alcohol. He was informed that the interview was being video recorded and specifically consented to the recording. He also acknowledged his right to make a telephone call. He was advised and acknowledged that he was not under arrest. He read the Miranda warnings out loud from a preprinted form, initialed each warning, and acknowledged that he understood and wished to waive those rights and answer questions. The video recorded statement commenced at about 12:22 A.M., on Sunday, December 9.

In his statement, the defendant stated that while walking from his residence at 157 Massasoit Street to Keeley's residence at 40 Truman Circle, he observed a Chevrolet Lumina with its engine running, the lights on, the trunk open, and the driver's side door open. A restaurant sign and pizza boxes were visible in the trunk. After watching the vehicle for about twenty minutes, the defendant decided it was abandoned, entered it, and drove around a nearby town. He later drove on a highway and saw signs for Brimfield and Brookfield. Eventually, he returned to his residence. When he got out of the automobile, he saw blood on the door handle and on his hands. He admitted that earlier he had telephoned the restaurant at which the victim worked and ordered a pizza to be delivered to 104 Arnold Street. He said this call was just a prank. The defendant denied ever encountering a pizza delivery person and, when showed a photograph of the victim, denied that he had seen him before. The video recorded statement ended by 4 A.M.

After the video recorded statement ended, the defendant agreed to take the detectives to the area where he first discovered the Lumina. Detectives Dean and O'Shea searched the area, but found nothing. On returning to the station, they asked the defendant whether he could stay while they checked a couple of matters. The defendant agreed and waited in the interview room. The detectives then learned from another detective that he (the other detective) had been to the defendant's residence and discovered bloody jeans that the other occupants of the apartment identified as belonging to the defendant. The detectives confronted the defendant with this information, and he began to cry. The

defendant admitted that he had robbed the pizza delivery man and cut him with a knife on the arm. The detectives advised the defendant that he was under arrest for armed robbery, kidnapping, and assault and battery by means of a dangerous weapon. They asked the defendant whether he wished to give them another statement, following the same procedures as had occurred for his first video recorded statement. The defendant agreed.

ii. *The second statement.* The second video recorded statement began at 9:53 A.M. The defendant agreed to have the interview video recorded. As reflected in the recording, before any questioning occurred, Detective Dean informed the defendant that he was under arrest for assault and battery by means of a dangerous weapon and armed robbery. The defendant was then advised of his Miranda rights in the same manner as done in connection with his first statement. He read each warning out loud from a printed form, initialed each warning, acknowledged that he understood the warnings, and waived them. In addition, he waived his right to make a telephone call. The defendant also was advised of his right to a prompt arraignment and waived that right orally and in writing on a printed form.

The defendant stated that he did not want to spend the rest of his life in jail and wanted to cooperate fully with police in the hope of being treated leniently. The defendant admitted that he had lied in his first statement. In summary, he stated that he had been angry about an argument he had with Keeley regarding another man. He called the restaurant only so he could get an automobile to go home. He placed an order to be delivered to 104 Arnold Street. When the victim, whom the defendant did not know, arrived, he got out of the automobile to make change. As the defendant demanded, "give me the car," the victim attempted to reenter his vehicle. To prevent the victim from getting away, the defendant took out a knife and slashed the victim on his arm above the elbow. The defendant pulled the victim from the automobile and ordered him to get into the trunk. The defendant had the victim take off one of his shoelaces and tie it around his arm to stop the bleeding. The defendant then drove to East Longmeadow and released the victim into a field. The defendant returned to his home in Springfield and did not see the victim again. The interview concluded at 12:12 P.M. Detective

Dean asked the defendant whether he would accompany them to the area where he released the victim; the defendant declined.

iii. *Midnight conversation.* At about midnight on December 9, Detective Misael Rodriguez was in the prisoner processing area close to the holding cells at the Springfield police department. As he walked near the defendant's cell, he heard tapping on the cell door. Detective Rodriguez responded and the defendant asked whether they could talk. Detective Rodriguez agreed and took the defendant to an interview room. Detective Rodriguez asked whether the defendant was certain that he wanted to talk without a lawyer present. The defendant stated that he was. The defendant stated that he wanted to take police to a new location to look for the victim. Detective Rodriguez informed his supervisor and arrangements were made to go to the area. Police searched the area, but found nothing. The defendant was returned to his cell.

iv. *The third statement.* The following day, Monday, December 10, Detective Dean spoke with officers who had processed the Lumina for evidence. There was little, if any, blood in the trunk, which was inconsistent with the defendant's statement that the victim's arm was bleeding heavily after he slashed it. When Detectives Dean and O'Shea confronted the defendant with this information, he broke down and began to cry. The defendant admitted that he had lied in his second statement. The detectives asked whether he would like to make another statement, and the defendant agreed. The defendant agreed to have his statement video recorded, and the recording commenced at 9:01 A.M. As reflected on the video recording, the Miranda warnings were administered to the defendant before he gave his statement. The Miranda warnings were provided on a printed form that the defendant was asked to read, initial, and sign, which he did. The defendant was asked whether he understood his rights and responded that he did. The defendant was advised of his right to make a telephone call, which he waived in writing. He also executed a written waiver of his right to a prompt arraignment. Before he did so, Detective Dean explained that in order for a statement then to be taken, the defendant was delaying the process of bringing him to court for his arraignment.

The defendant stated that he did not cut the victim with a

knife before putting him in the trunk. Rather, he forced the victim into the trunk at knifepoint. The defendant initially drove to East Longmeadow with the victim in the trunk, but concluded that he was too close to Springfield, so he drove toward Palmer and Brimfield. At some point he turned off a main road and headed up a hill. The defendant stopped at an opening that led to a field. The defendant unlocked the trunk and ordered the victim to start walking. The defendant followed. When they arrived at a stone wall, the defendant told the victim to kneel and take his glasses and jacket off. The victim asked several times to be let go. The defendant slashed the victim's wrists with a knife and cut his throat repeatedly. The victim made grunting noises. The defendant asked the victim to climb over a wall and the victim complied. The defendant ordered the victim to remove a bootlace and then used it to choke him. The victim shook and flailed, and made noises. The defendant plunged a knife into the victim's throat and left him to die. The defendant returned to the automobile and eventually went home. The recording ended at 10:54 A.M.

v. *Procedures for taking the statements.* Detective O'Shea typed each of the defendant's statements as they were being given. At the end of each interview, the defendant was provided an opportunity to read the typewritten statements and correct any errors. The defendant read each statement in its entirety, made corrections where he felt appropriate, and signed each page. Aside from two emotional breakdowns when he was confronted with inconsistencies between a statement and the physical evidence, the defendant remained composed throughout the interviews. The emotional breakdowns were momentary. Otherwise, the defendant was responsive, articulate, and cooperative throughout. The tone of questioning was calm and professional.

c. *Discovery of the victim.* After giving the third statement, the defendant requested to help find the victim. The detectives obtained warm clothing for the defendant and placed him in their cruiser. From some of the defendant's earlier statements, the detectives believed that the victim's body was somewhere in Monson, although the defendant could not say exactly where. Unfamiliar with Monson, they contacted Chief Steven Kozloski of the town's police department to obtain his help. Chief Koz-

loski met Detectives Dean and O'Shea, as well as the defendant, in Monson near a particular campground. Chief Kozloski entered their vehicle and spoke with the defendant about where he had left the victim. Based on that conversation, Chief Kozloski determined an area to search. Eventually, the defendant recognized an area that looked familiar. They all got out of the vehicle and walked across a field. As they did, Detective Dean observed a rock wall that was consistent with the defendant's earlier description of the spot where he had taken the victim. They observed a coat on the ground. The defendant stated, "Oh my God, that's the coat." The defendant was ordered to stay back. Shortly thereafter, at about 3:05 P.M., Detective Dean discovered the victim's body on the other side of the rock wall (on which there was blood) and down a hill.

d. *The telephone call from the defendant's appointed counsel.* On December 10, having been appointed to represent the defendant, the appointed counsel went to meet him at the Hampden County court house. Before arriving, the appointed counsel was informed over the telephone that the defendant was still at the Springfield police department. The appointed counsel went there and met with Officer Richard Goodreau at 2:48 P.M. Officer Goodreau informed him that the defendant was out of the building with the detectives. At the appointed counsel's request, Officer Goodreau made several unsuccessful attempts to contact the detectives by radio and cellular telephone. At about 3 P.M., Officer Goodreau received a telephone call from a Captain McFarlin who was participating in the search for the victim. The appointed counsel spoke directly to Captain McFarlin and explained that he had been appointed to represent the defendant, it was imperative that he speak with him as soon as possible, and he did not want the defendant answering any more questions. Captain McFarlin explained that they were looking for a body, there was only one hour of daylight left, and he would not immediately return the defendant to the station to meet with the appointed counsel. After arguing back and forth, Captain McFarlin said that he was not in the defendant's presence, but that he would have the defendant contact the appointed counsel. He gave Captain McFarlin his cellular telephone number.

Captain McFarlin promptly telephoned Detective O'Shea, as

he, Detective Dean, Chief Kozloski, and the defendant were traveling in Monson. Captain McFarlin explained that counsel had been appointed to represent the defendant and wanted to speak with him. Detective O'Shea immediately communicated that information to the defendant and the detectives offered the defendant a cellular telephone to telephone the appointed counsel. Without hesitation, the defendant stated that he was not interested in speaking with anyone and that he was more interested in finding the victim for the family's sake. Shortly thereafter, at about 3:05 P.M., the victim's body was found.

e. *The denial of the motion to suppress the defendant's statements.* i. *Custody.* We agree with the judge's conclusion that for purposes of *Miranda* v. *Arizona,* 384 U.S. 436 (1966), the defendant was not in custody until he was placed under arrest *after* he had given his first video recorded statement and had confessed, when confronted with information that police had recovered bloody clothing identified as his from his residence, that he had robbed the victim and had cut him on the arm. "Miranda warnings are only necessary where one is the subject of 'custody and official interrogation.' " *Commonwealth* v. *Larkin,* 429 Mass. 426, 432 (1999), quoting *Illinois* v. *Perkins,* 496 U.S. 292, 297 (1990). A defendant bears the burden of proving that he was in custody. *Commonwealth* v. *Larkin, supra.* "A person is in custody whenever he is 'deprived of his freedom of action in any significant way.' " *Commonwealth* v. *Groome,* 435 Mass. 201, 211 (2001), quoting *Commonwealth* v. *Haas,* 373 Mass. 545, 551 (1977), *S.C.,* 398 Mass. 806 (1986). "The crucial question is whether, considering all the circumstances, a reasonable person in the defendant's position would have believed that he was in custody." *Commonwealth* v. *Groome, supra,* quoting *Commonwealth* v. *Damiano,* 422 Mass. 10, 13 (1996). "In assessing the circumstances, the court considers several factors: (1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of

the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest." *Commonwealth* v. *Groome, supra* at 211-212, and cases cited.

Here, the defendant points to the fact that the initial questioning took place at the police station, but that "does not, in itself, brand an interrogation as custodial." *Commonwealth* v. *Bookman,* 386 Mass. 657, 660 (1982). The defendant went there voluntarily with Detective Cass, suggesting that the questioning occurred in a noncustodial setting. See *Commonwealth* v. *Gil,* 393 Mass. 204, 212 (1984). Although the initial questioning occurred in the late evening, the police were faced with a report of a missing person, so waiting to investigate could have had dire consequences. All questioning occurred in a professional manner and was not aggressive or threatening in any way. In addition, nothing was conveyed to the defendant that suggested he was a suspect, and Detectives Dean and O'Shea specifically advised him that he was not under arrest, that he was not obligated to speak with them, and that he was free to leave.

We reject the defendant's claim that, in essence, he became a suspect because of Detective Cass's observation of the Chevrolet keys in his possession and because he was questioned about his possession of those keys. Neither the questions nor the statements of Detective Cass or Detective Dean to the defendant concerning the keys transformed the encounter into a custodial interrogation. The victim's automobile had not been reported stolen, and no one knew how the defendant acquired the victim's keys or whether someone had given them to him. At that point there had been no report of a crime, only a missing person report involving a person with whom the defendant possibly made contact earlier for the purchase of a pizza or with regard to a prank.[2]

The judge's conclusion that the defendant was not then in

[2]Before making his first statement, the defendant had admitted that he had found the victim's automobile, drove it around, and abandoned it in the area of a "senior living center" in Springfield. The judge credited the detectives' testimony that, despite these admissions, each detective considered the defendant free to leave and not in custody. The detectives explained the basis for their opinions. Although suspicions were emerging, there had been no crime yet as the victim's automobile had not been reported stolen (and had not been found) and the detectives did not know how the defendant had obtained the keys to the automobile or whether the owner had allowed the defendant to use his automobile. As explained by Detective O'Shea, "I didn't [then] know what

custody is amply supported. The judge correctly determined that suppression of any statements made by the defendant prior to his arrest was not warranted. Because these statements were not illegally obtained, we reject the defendant's contention that all subsequent statements must be suppressed under the "fruit of the poisonous tree" doctrine set forth in *Wong Sun* v. *United States,* 371 U.S. 471, 488 (1963). Cf. *Commonwealth* v. *Ferguson,* 410 Mass. 611, 616 (1991).

ii. *Voluntariness.* The defendant contends that, contrary to the judge's ruling, his second and third video recorded statements to the police were involuntary because they were the product of coercion. He claims that his statements were the result of coercive circumstances, namely, a lack of sleep, physical discomfort arising from having been placed in a cold cell without adequate clothing or blankets, a debilitated emotional state, and early morning questioning.

"Due process requires a separate inquiry into the voluntariness of [a defendant's statement] apart from the validity of the Miranda waiver." *Commonwealth* v. *Magee,* 423 Mass. 381, 387 (1996), and cases cited. This determination involves examination of the totality of the circumstances surrounding the making of the statement to make sure that the defendant's statement was a free and voluntary act and was not the result of inquisitorial activity that had overborne his will. *Id.* "Relevant factors include, but are not limited to, 'promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings." *Commonwealth* v. *Selby,* 420 Mass. 656, 663 (1995), quoting *Commonwealth* v. *Mandile,* 397 Mass. 410, 413 (1986). The burden is on the Commonwealth to prove voluntariness beyond a reasonable doubt. *Commonwealth* v. *Edwards,* 420 Mass. 666, 669 (1995).

happened. It's a missing person's report. It's not uncommon that missing persons show up days later [and] sometimes they're drug abusers, and I didn't know what we had here." Essentially, the Miranda warnings then given to the defendant were administered as a precaution and were not required. The judge's conclusion regarding when the defendant was "in custody" in the constitutional sense is supported by the evidence he found credible and need not be disturbed.

The findings of the judge included determinations that, at the time of the statements, the defendant confirmed that he was not under the influence of either drugs or alcohol; he willingly responded to questions without hesitation or inquiry; he answered clearly and intelligently; there was no evidence of any coercive conduct by the police; his two emotional "breakdowns" had been momentary and he otherwise was responsive, articulate, and cooperative; and he did not complain about his condition or how he was being treated. The judge addressed the fact that the defendant was tired and had been cold, but concluded, based in part on his review of the video recordings, that there was nothing about the nature of the interrogations or the manner in which they were conducted to suggest that his will was overborne. Our review of the record demonstrates that although, at one point, the defendant indicated that he had been unable to sleep because he was upset over what had occurred with the victim, the police certainly did provide him with the opportunity to rest between questioning. See *Commonwealth* v. *Hunter*, 426 Mass. 715, 724 n.4 (1998) (factor in determining voluntariness is whether defendant is given opportunity to rest between questioning). We add that the defendant's second and third video recorded statements started, respectively, at 9:53 A.M. (Sunday) and 9:01 A.M. (Monday), and were made in response to recent developments in the case (specifically, with regard to the second statement, in response to the police discovery of the defendant's bloody jeans at his residence; concerning the third statement, in response to forensic information about the amount of blood found in the trunk of the victim's automobile). Thus, it was appropriate for police to speak with the defendant about the new information and they did not do so at an inappropriate time. See *Commonwealth* v. *Beland*, 436 Mass. 273, 284 n.5 (2002) (although "off-hour interrogation" is disfavored, new information may make reinterrogation appropriate). Further, both statements were given only after the defendant had been advised of, and made a knowing, intelligent, and voluntary waiver of his Miranda rights. See *Commonwealth* v. *Selby*, *supra* (in determining voluntariness, factor to consider is "details of the interrogation, including the recitation of Miranda warnings"). The judge's findings, which have an evidentiary basis in the record, support

his conclusion that the defendant's statements were voluntarily made, and we see no basis to disturb this ruling.

iii. *Delay between arrest and arraignment.* We reject the defendant's argument that all of his statements should have been suppressed under *Commonwealth* v. *Rosario*, 422 Mass. 48, 56 (1996), because he was not arraigned until sixty hours after his initial apprehension. In *Commonwealth* v. *Rosario*, *supra*, the court held that an "otherwise admissible statement is not to be excluded on the ground of unreasonable delay in arraignment, if the statement is made within six hours of the arrest (day or night), or if (at any time) the defendant made an informed and voluntary written . . . waiver of his right to be arraigned without unreasonable delay." See Mass. R. Crim. P. 7 (a) (1), as appearing in 442 Mass. 1506 (2004) ("A defendant who has been arrested shall be brought before a court if then in session, and if not, at its next session"). Although the judge did not address the issue in his decision, his findings as well as the record make clear that the defendant executed a written waiver of his *Rosario* rights after he was arrested and just before making his second statement at about 10 A.M. on Sunday, December 9, and again prior to making his third statement on Monday, December 10, at about 9 A.M. The defendant's argument is predicated on his claim that he did not waive his *Rosario* rights when he first voluntarily went to the police station for questioning on Saturday evening, December 8. The six-hour safe harbor period announced in *Rosario*, however, applies when a defendant is arrested, not in circumstances where a person voluntarily goes to a police station for questioning. See *Commonwealth* v. *Martinez*, 458 Mass. 684, 694-695 (2011).

The defendant also contends that his written waivers of his right to a prompt arraignment pursuant to *Commonwealth* v. *Rosario*, *supra*, were not voluntary for the same reasons he claims that his statements were not voluntarily made (for example, because he was cold and tired). Because we reject his argument that his statements were not voluntarily made, this contention similarly fails.

iv. *Duty to inform the defendant of the appointed counsel's communication.* The defendant argues that his rights pursuant to art. 12 of the Massachusetts Declaration of Rights were violated

because the detectives failed to notify him of part of the substance of his appointed counsel's communication, namely, the fact that the appointed counsel did not want the defendant to be questioned further by police. Consequently, the defendant contends that all statements he made to police and all evidence obtained after the attempted contact should have been suppressed. See *Commonwealth* v. *McNulty*, 458 Mass. 305, 318 (2010). See also *Commonwealth* v. *Martin*, 444 Mass. 213, 221 (2005) (adopting common-law rule that physical evidence obtained from failure to provide Miranda warnings is presumptively excludable).

In *Commonwealth* v. *Beland, supra* at 287, we summarized our law concerning the procedures to be followed if an attorney contacts police before or during the interrogation of a suspect or defendant:

"We considered whether art. 12 provides greater protection for criminal defendants than the Federal Constitution, in the wake of *Moran* v. *Burbine*, 475 U.S. 412, 422 (1986) (holding Fifth Amendment does not require that police inform defendant of attorney's efforts to make contact because '[e]vents occurring outside the presence of the suspect and entirely unknown to him surely . . . have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right'). *Commonwealth* v. *Mavredakis*, [430 Mass. 848, 856 (2000)], quoting *Moran* v. *Burbine, supra.* We concluded that it does, noting that '[t]he history of art. 12 and our prior interpretations of its self-incrimination provisions . . . lead to the conclusion that art. 12 provides greater protection than the Federal Constitution does.' *Commonwealth* v. *Mavredakis, supra* at 859. See *Commonwealth* v. *Cryer*, 426 Mass. 562, 568 (1998). Focusing on a difference between 'the abstract right to speak with an attorney mentioned in the Miranda warnings, and a concrete opportunity to meet "with an identifiable attorney actually able to provide at least initial assistance and advice," ' we reasoned that 'the duty to inform a suspect of an attorney's efforts to render assistance is necessary to actualize the abstract rights listed in *Miranda* v. *Arizona*, 384 U.S. 436 (1966).' *Commonwealth* v. *Mavredakis, supra* at 859-860, quoting *State*

v. *Haynes*, 288 Or. 59, 72 (1979), cert. denied, 446 U.S. 945 (1980). We established a bright-line rule, providing that police must stop questioning and inform a suspect immediately of attempts of an attorney identifying himself or herself as counsel acting on the suspect's behalf to contact the suspect. *Id.* at 861. If the suspect accepts the attorney's assistance, police must suspend questioning until the suspect is afforded an opportunity to confer with the attorney either in person or by telephone. *Id.* The consequence of failing to inform a suspect of an attorney's efforts to make contact is to render 'any waiver of rights that has been given . . . "inoperative" for further admissions.' *Id.*, citing *Commonwealth* v. *McKenna*, 355 Mass. 313, 324 (1969)."

The burden is with the Commonwealth to prove "that the suspect declined the offer of legal advice." *Commonwealth* v. *Mavredakis, supra* at 861.

Here, the judge found that the defendant had been timely informed of the appointed counsel's attempts to contact him and concluded that there was no *Mavredakis* error. At the time of his ruling, however, *Commonwealth* v. *McNulty*, 458 Mass. 305 (2010), had not been decided. In *Commonwealth* v. *McNulty, supra* at 317-318, we concluded that, "[w]hile the police are not required to 'deliver verbatim to a defendant the message given by his attorney,' *Commonwealth* v. *Vao Sok*, [435 Mass. 743, 752 (2002), an attorney's] particular message — not to talk to the police — fell within the duty to inform because 'it bore directly on the right to counsel.' *Commonwealth* v. *Mavredakis, supra* at 861." We determined that "because the police did not convey adequately to the defendant the substance of his attorney's telephone message and advice [not to talk to the police], the defendant's subsequent indication that he would continue to speak to the police did not constitute a knowing or intelligent waiver of the Miranda rights." *Commonwealth* v. *McNulty, supra* at 318. In this case, the police did not convey to the defendant that his appointed counsel expressed that he did not want the defendant to be questioned further by police, which, in essence, instructed the defendant to stop answering any of their questions.[3] Pursuant to *Commonwealth* v. *McNulty, supra*, this omission by police

---

[3]Citing the appointed counsel's testimony at the evidentiary hearing, the

constitutes error.[4] We look to determine whether the defendant objected to the admission of any such statements and evidence (obtained after the appointed counsel's attempted contact) at trial, and if so, whether the admission of such evidence at trial was harmless beyond a reasonable doubt. *Id.*

The defendant renewed his motions at trial but they were denied. At trial, the jury heard that, after the defendant was informed that his appointed counsel was trying to contact him, the defendant rejected Detective Dean's offer of a cellular telephone to contact the appointed counsel, saying, "No, I just want to find this body." The jury learned also that the defendant pointed to an area that "looked familiar," which was where the victim's body was found. Thus, it is these statements, coupled with the victim's body and all forensic evidence derived from it, that the defendant claims were improperly admitted. However, the jury also learned that, prior to the appointed counsel's attempted contact, the defendant, after having been given and waived his Miranda rights, already had admitted to having killed the victim and had given a lengthy video recorded statement (the third statement) to police explaining how he had killed the victim. Further, the jury had been informed that before the attempted contact, the defendant had provided detailed descriptions to Chief Kozloski concerning where the victim's body would be found, making its

Commonwealth contends that the appointed counsel "agreed" with Captain McFarlin that the only information that would be conveyed to the defendant was the request that the defendant contact the appointed counsel. The conversation, however, is taken out of context. The appointed counsel had no choice other than to accept what Captain McFarlin offered to relay because Captain McFarlin "was pretty set in his position" that there was only one hour of daylight remaining and the police would not be returning to the station with the defendant because they wanted to complete the search for the victim. The appointed counsel made it clear at the outset that he wanted his client told that he did not want the defendant to be questioned further, but Captain McFarlin only would "have the defendant [who was not in Captain McFarlin's presence] call [appointed counsel]."

[4]The Commonwealth correctly notes in its brief that the court's opinion in *Commonwealth* v. *McNulty*, 458 Mass. 305 (2010), was divided on this point, although the Commonwealth does not expressly argue that *McNulty* was incorrectly decided. As the discussion that follows in the text indicates, we conclude that the violation of the defendant's rights in this regard was harmless beyond a reasonable doubt. Accordingly, we need not revisit the *McNulty* holding in the present case, and we leave any reexamination of that case to another day.

discovery inevitable. In these circumstances, any so-called *Mavredakis* error (as construed by *Commonwealth* v. *McNulty, supra*) was harmless beyond a reasonable doubt.

2. *Trial.* The evidence at trial was substantially similar to the facts established at the motion to suppress hearing and included admission of the defendant's three statements to police.[5] Thus, we need not repeat the facts that mirror those found at the suppression hearing. In addition, the Commonwealth presented blood and deoxyribonucleic acid evidence linking the defendant to the crime. Further evidence included testimony of the medical examiner who performed the victim's autopsy. The medical examiner's testimony concerning the location of the victim's injuries corroborated the defendant's account in his third statement. Specifically, the medical examiner stated that the victim suffered two incise wounds, one on each side of his neck; a stab wound below the angle of the right lower jaw; a stab wound to the back of the left neck; two incise wounds, one on each wrist; and a thin purple mark consistent with a ligature mark around his neck. The medical examiner concluded that the victim died as a result of sharp force injuries to his neck and wrists and ligature strangulation.

The defendant testified. He stated that in the two to three weeks before the victim's killing, he had encountered the victim, had chatted with him, and on four to five occasions had accepted rides home from him in his automobile. The defendant explained that, on the day of the killing, he had telephoned for a pizza so that he could get a ride home from the victim. Once they met, the victim agreed to give the defendant a ride home. As they drove, the victim decided to disregard his last pizza delivery so they could "hang out a little," and drove to the field where his body eventually was recovered. There, the victim parked his automobile and he and the defendant talked and smoked cigarettes. The defendant claimed that the victim touched his left thigh and tried to kiss him. Because he had been sexually abused by his brother as a child, the defendant was scared and jumped out of the automobile. The defendant maintained that the victim followed him, yelling at him. Because the victim had previously shown the defendant a knife (in the automobile),

---

[5]The jury viewed copies of the video recorded statements of the defendant.

the defendant was scared when the victim was "coming at him" with one hand waving and one hand by his side. The defendant took out his knife and stabbed the victim in the neck. The victim kept coming at the defendant, so the defendant continued swinging the knife in all directions. The victim stopped and headed over to a wall, climbed over it, and walked into the woods. The defendant followed and used the victim's bootlace to try "to keep the gash on the victim's neck shut." The defendant "took off" in the victim's automobile after seeing a nearby light turn on. He took the knife and bloody bootlace with him. At home, the defendant washed his clothes and then went to see his girl friend. The defendant stated that he had lied to police because he was embarrassed and did not want to "get in trouble." He was tired and cold when he made his statements to police. He made the third statement in response to police assurances that because it was a "crime of passion," he would not be charged with murder.

In addition to the defendant's testimony, the defense relied on the cross-examination of several witnesses to suggest that the defendant's statements to police had not been voluntary because he had been tired and cold, and lacked adequate nutrition. The defendant's trial counsel argued that the defendant had acted in self-defense and that his trial testimony was truthful.

In rebuttal, the Commonwealth submitted evidence that after the victim's shift ended on November 3, 2007, he had only worked once, on November 30, from 5 to 6 P.M., prior to December 7. The victim had not been working because his automobile had broken down and he had no vehicle to make deliveries. When the victim came in on November 30 to work, his automobile again broke down. On December 7, the victim returned to work stating that his automobile had been repaired.

a. *Prosecutor's closing argument.* We agree with the defendant that the prosecutor erroneously misstated the law of deliberately premeditated murder during his closing argument by improperly suggesting that on that theory of murder only an intent to kill was required to be proved.[6] See *Commonwealth* v. *Zanetti,* 454 Mass. 449, 455 (2009) (to prove deliberately

---

[6]While the prosecutor remarked that "it only takes a few seconds in order to form that intention to kill," he did not explain that this concept refers to

premeditated murder, Commonwealth must prove that defendant acted with malice, namely, with intent to kill, and that defendant's decision to kill was product of cool reflection). Because the defendant objected to the closing argument on this point, we review to determine whether the error was prejudicial. *Commonwealth* v. *Francis*, 450 Mass. 132, 141 (2007), and cases cited. In so doing, we consider "(1) whether the defendant seasonably objected; (2) whether the error was limited to collateral issues or went to the heart of the case; (3) what specific or general instructions the judge gave the jury which may have mitigated the mistake; and (4) whether the error, in the circumstances, possibly made a difference in the jury's conclusions." *Commonwealth* v. *Perez*, 444 Mass. 143, 151 (2005), quoting *Commonwealth* v. *Kater*, 432 Mass. 404, 422-423 (2000).

Here, the prosecutor's misstatement of the law was isolated and comprised only a small portion of his argument. The error pertained only to one of the three theories of murder. Significantly, in his charge the judge instructed the jury that it was his (the judge's) job to provide them with the law and that they "must take the law" given by him to decide the case. See *Commonwealth* v. *Szczuka*, 391 Mass. 666, 673-674 (1984) (in concluding no harm came to defendant from prosecutor's possible misstatement of law, potential harm was mitigated by several factors, including fact that judge told jury it was his function to instruct them on law of case). The judge then followed with a correct instruction on the elements of deliberately premeditated murder, see *Commonwealth* v. *Stewart*, 460 Mass. 817, 824-826 & n.7 (2011), and permitted the jurors to take a copy of his written instructions into deliberations, thus "supplying a lasting reminder of the jury instructions and judge's comments," *Commonwealth* v. *Amirault*, 404 Mass. 221, 238 (1989). In view of the judge's oral and written instructions to the jury, which we presume are followed, see *Commonwealth* v. *Pope*, 406 Mass. 581, 588 (1990), and the strength of the Commonwealth's evidence, including the defendant's confession in his third state-

deliberation, did not expand any further on the concept of deliberation, and did not indicate that this concept is also a required element of deliberately premeditated murder. See *Commonwealth* v. *Stewart*, 460 Mass. 817, 824-826 & n.7 (2011).

ment, we conclude that the prosecutor's misstatement does not require reversal and could not possibly have made a difference in the jury's conclusions.

b. *Ineffective assistance of counsel.* i. *Failure to obtain expert.* The defendant argues that the failure of his trial counsel to obtain an expert on sleep deprivation as it related to the defendant's mental state created a substantial likelihood of a miscarriage of justice. The defendant maintains that it is "clear" that his sleep deprivation was "critical to his defense."

The defendant's claim is not supported by any affidavits. See *Commonwealth* v. *Linton,* 456 Mass. 534, 555-556 (2010) (failure of defendant to produce affidavit of expert fatal to ineffective assistance of counsel claim). We point out also that the defendant did not raise this issue through a motion for a new trial. See *Commonwealth* v. *Zinser,* 446 Mass. 807, 810 (2006) (preferred way to raise claim of ineffective assistance of counsel is through new trial motion). "[A]n ineffective assistance of counsel challenge made on the trial record alone is the weakest form of such a challenge because it is bereft of any explanation by trial counsel for his actions." *Commonwealth* v. *Peloquin,* 437 Mass. 204, 210 n.5 (2002). For such a claim to be successful, counsel's inadequate performance must "appear[] indisputably on the trial record." *Commonwealth* v. *Zinser, supra* at 811.

Here, the defendant's trial counsel used evidence of the defendant's lack of sleep (from the defendant's testimony and the cross-examination of police witnesses) to challenge the defendant's statements to police as involuntary. The defendant does not explain what evidence a sleep deprivation expert would offer independent of this evidence or how such unspecified expert testimony would have accomplished something material for the defense. See *Commonwealth* v. *Satterfield,* 373 Mass. 109, 115 (1977). We are unable to conclude from the record before us that the defendant's claim has any merit.

ii. *Jury instructions.* At trial the defendant testified that, at about 11 P.M. on Friday, December 7 (which was, at least by his account, three and one-half hours before the murder), he had a couple of "shots" of whiskey and vodka. The defendant argues that his trial counsel was ineffective in failing to request a jury

instruction on the effects of alcohol relative to the defendant's mental state. A voluntary intoxication instruction is not required "where the evidence does not suggest a condition of 'debilitating intoxication' that could support a reasonable doubt as to whether [the] defendant was capable of forming the requisite criminal intent." *Commonwealth* v. *James*, 424 Mass. 770, 789 (1997), and cases cited. Because the evidence, viewed in a light most favorable to the defendant, see *Commonwealth* v. *Little*, 431 Mass. 782, 783 (2000), showed only alcohol consumption, but not " 'debilitating intoxication' that could support a reasonable doubt as to whether [the] defendant was capable of forming the requisite criminal intent," *Commonwealth* v. *James*, *supra*, the evidence did not warrant a voluntary intoxication instruction. As such, the defendant's argument that his counsel, by failing to request the instruction, created a substantial likelihood of a miscarriage of justice, lacks merit. See *Commonwealth* v. *Morgan*, 460 Mass. 277, 292-293 (2011).

c. *Relief pursuant to G. L. c. 278, § 33E.* We have reviewed the entire record and discern no basis to grant relief under G. L. c. 278, § 33E.

*Judgments affirmed.*